**WATSON'S CARPET AND FLOOR COVERINGS, INC.**

v.

**Rick McCORMICK, et al.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Jan. 12, 2006 Session.

Jan. 18, 2007.

Permission to Appeal Denied by Supreme Court May 14, 2007.

Alan Mark Turk, Brentwood, Tennessee, for the appellants, Rick McCormick and Carpet Den, Inc.; R. Carl Cannon, William A. Blue, Jr., Kaz Kikkawa, Nashville, Tennessee, for the appellant, Mohawk Industries, Inc.

R. Scott Jackson, Jr., Nashville, Tennessee, for the appellee, Watson's Carpet and Floor Coverings, Inc.

## OPINION

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

This case involves questions of liability under the recently recognized tort of intentional interference with existing or prospective business relationships. Because a necessary element of that tort is "improper motive" or "improper means," and because refusal to deal is not improper but is, instead, privileged, we reverse the judgment against the supplier. The judgments against both the supplier and the competitor for conspiracy based on the privileged conduct is also reversed. We affirm the judgment against the competitor for intentional interference with business relationships.

## I. FACTS

Watson's Carpet and Floor Coverings, Inc. ("Watson") is a retail carpet dealer that purchases carpet from various carpet manufacturers for resale. Among its customers are commercial developers that purchase large quantities of carpet for projects under development. Until 1998, Centex of Nashville ("Centex") had been one of Watson's commercial customers. In the past, Centex purchased carpet manufactured by another manufacturer, Queen, from Watson for the residential projects it was developing. A competitor of Watson, Carpet Den, Inc. ("Carpet Den"), had also supplied carpet to Centex, but the carpet provided by Carpet Den to Centex was manufactured by a different company, Shaw.

In 1999 Centex entered into exclusive carpet purchasing agreements with Mohawk Industries, Inc. ("Mohawk"), a major carpet manufacturer. Centex agreed it would use only Mohawk "Portico" carpet for its residential developments in exchange for certain concessions, including reduced prices. The propriety and legality of the exclusive purchasing agreement is not the subject of dispute. Centex asked Mohawk to make the Portico carpet available to both of Centex's existing dealers—Watson and Carpet Den. This lawsuit arises from Mohawk's decision to allow only Carpet Den to deal in the Mohawk

Portico carpet with Centex. As a result, Watson was unable to supply Centex with carpet thus losing Centex as a customer. Mohawk would sell Watson any other carpet it manufactured except the Portico brand for resale to Centex. Mohawk allowed Watson to sell Portico to clients other than Centex. Watson had no contractual relationship with its manufacturer, Mohawk, or its customer, Centex, relevant to this lawsuit.

Thereafter, in 1999, Watson sued Mohawk, Carpet Den, and Carpet Den's owner, Rick McCormick, for tortious interference with business relationships and civil conspiracy. First, according to Watson, Mohawk tortiously interfered with Watson's business with Centex. Second, Watson also alleged that Carpet Den and its owner tortiously interfered with Watson's business relationship with Mohawk and Centex. Finally, Watson alleged that Carpet Den's owner and Mohawk's employees/agents civilly conspired to destroy Watson's business relationships with Mohawk and Centex. According to Watson's complaint, the "object of the conspiracy" was achieved by Mohawk's refusal to sell Watson the Portico carpet required by Centex resulting in the destruction of Watson's relationship with Centex. Thereafter, in 2000, the trial court granted the defendants summary judgment finding that Tennessee did not recognize the tort of intentional interference with a business relationship.

On appeal, the trial court's judgment was originally affirmed because under *Nelson v. Martin*, 958 S.W.2d 643 (Tenn.1997), Tennessee did not recognize the tort of intentional interference with a non-contractual business relationship. *Watson's Carpet and Floor Coverings, Inc. v. McCormick et al.*, No. M2000–03101–COA–R3–CV, 2002 WL 121626 (Tenn.Ct. App. Jan.30, 2002). Thereafter, in an Opinion on Petition to Rehear, *Watson's Carpet and Floor Coverings Inc. v. McCormick*, No. M2000–03101–COA–R3–CV, 2002 WL 562577 (Tenn.Ct.App. April 15, 2002) (perm. app. denied Oct. 7, 2002), the Court of Appeals reconsidered and reversed the trial court citing *Trau–Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691 (Tenn.2002). Specifically, the Court of Appeals found as follows:

> In *Trau–Med*, the Western Section of this Court found that an action for tortious interference with an ongoing—although not contractual—business relationship was a viable cause of action in this State. The Supreme Court accepted an application to appeal and, as to this point, affirmed the Western Section in an opinion filed in Jackson, March 25, 2002. The Supreme Court opinion narrows the holding of *Nelson v. Martin*, 958 S.W.2d 643 (Tenn.1997), the case we relied upon in our original opinion.
>
> In light of the foregoing, we deem it appropriate to vacate our previous opinion and instead—because there are disputed issues of material facts bearing on the question of the Defendants' liability which would preclude entry of a summary judgment—remand the case for trial in accordance with the directives of the Supreme Court in *Trau–Med*.

*Watson's*, 2002 WL 562577, at *1.

The case was then tried before a jury in July of 2004. The jury gave its verdict in the form of answering eleven (11) special questions. With regard to Mohawk's liability, the jury found that Mohawk "intentionally and improperly interfered" with Watson's business relationship with Centex. With regard to the liability of Carpet Den and its owner, the jury found that they "intentionally and improperly interfered with Watson's ... business relationship with Mohawk ... causing Mohawk to refuse to sell Watson carpet for Centex

... construction projects." The jury declined to find that Carpet Den and its owner interfered with Watson's relationship with Centex. As to the conspiracy, the jury found that all three defendants conspired to "intentionally and improperly" interfere with Watson's prospective business relationship with Centex. The jury found Watson sustained $1,384,180 in past damages and $249,314 in future damages as a result of defendants' actions. Finally, as to punitive damages, the jury found that only Mohawk should be assessed punitive damages of $3,750,000, which the trial court then approved. The defendants filed motions to alter or amend or for a new trial which were denied. This appeal followed.

## II. TENNESSEE SUPREME COURT DECISIONS DISCUSSING THE TORT OF INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

▆▆▆ There is no question that Tennessee recognizes the existence of a tort that protects contractual relationships. There is both a common law and statutory tort called inducement of breach of contract that allows recovery when a third party causes a breach of contract.[1] *Quality Auto Parts Co., Inc. v. Bluff City Buick Co. Inc.,* 876 S.W.2d 818, 822 (Tenn.1994); Tenn.Code Ann. § 47–50–109. The issue presented in this case involves the parameters of a tort that protects the less defined interests of existing non-contractual business relationships and prospective business relationships.

In *Nelson v. Martin,* 958 S.W.2d 643 (Tenn.1997), *overruled by Trau–Med of America, Inc. v. Allstate Insurance Co.,* 71 S.W.3d 691 (Tenn.2002), the Tennessee Supreme Court declined to recognize the tort of wrongful interference with prospective business advantage. At that time, the Court reasoned that while policy reasons supported recognizing the tort of interference with contractual relations, these policy reasons did not support recognition of the tort to protect prospective, *i.e.* non-contractual, relationships.

> The action for interference with contract is based on society's need for stability in contractual relations. "The tort protects society's interest in preserving the formal integrity of contract and rests on an implicit appreciation of the fundamental structure-giving significance of contracts in a market economy."

*Nelson,* 958 S.W.2d at 645–46, *quoting* John Danforth, *Tortious Interference with Contract. A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity,* 81 Colum. L. Rev. 1491, 1523 (1981).

The Court in *Nelson* was concerned that a tort protecting prospective relationships is "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." *Id.* at 646, *citing* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 979 (5th ed.1984). The crux of the Court's objections to and criticism of the tort was twofold. First, the Court was concerned that protecting prospective economic advantage would weaken the significance and importance of contractual relationships. *Nelson,* 958 S.W.2d

---

1. In order to establish a cause of action for wrongful inducement of a breach of contract, the plaintiff must prove there is a legal contract, of which the wrongdoer is aware, that the wrongdoer maliciously intended to induce a breach, that as a proximate result of the wrongdoer's action a breach occurred, and that plaintiff was damaged. *Quality Auto,* 876 S.W.2d at 823.

at 646. Second, the Court was concerned that recognizing the tort would weaken the legal principles underlying free competition. *Id.*

Five years after *Nelson,* the Tennessee Supreme Court in *Trau–Med, supra,* "adopted" the tort of intentional interference with existing or prospective business relationships.[2] *Trau–Med,* 71 S.W.3d at 701. Trau–Med was a physician practice management company whose purpose was to provide medical care to uninsured and indigent personal injury victims with meritorious claims. Trau–Med got referrals from attorneys and was then paid from either settlements or judgments.

Trau–Med sued Allstate Insurance Company claiming that Allstate defamed Trau–Med in an attempt to ruin its reputation in the legal community. *Id.* at 695. Among the grounds for recovery, Trau–Med alleged "tortious interference with a business relationship accompanied by a malicious and intentional motive to destroy and/or damage Trau–Med's business." *Id.* at 695–96. The trial court granted Allstate's motion to dismiss the tortious interference claim.

The question presented to the Supreme Court in *Trau–Med* was whether Tennessee would recognize a claim based on interference with non-contractual business relationships and, if so, what proof was necessary to sustain such a claim. The Court looked at the history of this issue in Tennessee beginning in 1915. *Id.* at 698–99. For 80 years, the courts in Tennessee "presumed" that an action for malicious conduct that prevented a third party from doing business with a plaintiff was sustainable in Tennessee, but no court had imposed liability based on this tort. *Id.* at 698. The Supreme Court stated that the tort had neither been expressly adopted

nor rejected prior to its decision in 1997 in *Nelson v. Martin, supra.* According to the Court in *Trau–Med,* at the time of the *Nelson* decision, the Court had not been willing to recognize the tort in its original form, as adopted by some other jurisdictions, because consideration of the propriety of a defendant's objective or motive was not an element of the cause of action. *Id.* at 699. Instead, as originally formulated, liability for the tort could lie "merely upon proof that a defendant's intentional acts resulted in a plaintiff's economic injury." *Id.*

Although the *Nelson* court had been unwilling to extend the tort of interference with contractual relationships, the Court in *Trau–Med* found that the situation justifying that earlier unwillingness had changed. The Court distinguished the situation as it existed in 1997, when *Nelson* was decided, and 5 years, later when the Court heard *Trau–Med,* based on the perception that the elements of the tort had been revised to require as an element "proof of improper conduct extending beyond the bounds of doing business in a freely competitive economy" that arise from "improper motives or from the use of improper means." *Id.* at 700. Given the transformation of the tort to require an intent to do something wrong, the Court in *Trau–Med* concluded that "continued abolition of the tort in this state would be unreasonable." *Id.* at 701.

The Court cited with approval the discussion of intentional interference with prospective business relationships found in Restatement (Second) of Torts § 766B which provides as follows:

> One who intentionally and *improperly* interferes with another's prospective contractual relation (except a contract to

---

**2.** The court expressly overruled that portion of its prior decision in *Nelson* that refused to

recognize the tort. *Trau–Med,* 71 S.W.3d at 701.

marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation. (emphasis added).

*Id.* at 700 n. 2 (emphasis in original).

■ The Court in *Trau–Med* went on to find that in order to prevail in Tennessee on the tort of intentional interference with existing or prospective business relationships, a plaintiff must be able to prove five (5) elements. First, plaintiff must prove "an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons." *Id.* By way of explanation, the Court expressly adopted the discussion in comment c to § 766B of the RESTATEMENT (SECOND) OF TORTS, which explains this particular element in more detail. *Id.* at 701 fn. 4. The business relationships protected by this tort "include any prospective contractual relations ... if the potential contract would be of pecuniary value," including a "continuing business or other customary relationship" which is non-contractual. *Id.* (*quoting* RESTATEMENT (SECOND) OF TORTS § 766B, cmt. c. (1979)). These include potential employment, opportunity to sell or buy, and options. *Id.* (*quoting* RESTATEMENT (SECOND) OF TORTS § 766B, cmt. c. (1979)).

■ Second, the defendant must know of the relationship, and this element is not met by "mere awareness" of plaintiff's general business dealings. *Trau–*

*Med,* 71 S.W.3d at 701. Third, the defendant must intend to cause the breach or termination of the business relationship. *Id.*

■ The fourth element of the tort was required as a prerequisite to the Court's recognition of the tort; namely, that a defendant must have an "improper motive" or use "improper means." It is important to note that *either* "improper motive" or "improper means" will suffice. *Id.* This is the element of the tort that is most relevant in this particular case. The Court in *Trau–Med* attempted to provide guidance as to how we can recognize "improper motive" or "improper means," even though it acknowledged that a precise or all-encompassing definition of "improper" was neither possible nor helpful. *Id.* at 701 n. 5. Impropriety will depend on the facts and circumstances. *Id.* However, the Court held that, in order to show that defendant had an "improper motive," the plaintiff must prove that defendant's "predominant purpose was to injure plaintiff." *Id.*[3]

■ With regard to "improper means," the Court provided some examples. The Court described these "improper means" as means that are illegal, independently tortious, or that violate an established standard of a trade or profession. *Id.* Examples of illegal or tortious conduct include violations of statutes, rules, or recognized common law rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty. *Id.* Less susceptible to a clear definition, the

---

**3.** In *Freeman Management Corporation v. Shurgard Storage Centers, LLC,* 461 F.Supp.2d 629, 640, (M.D.Tenn. 2006), the court found that this requirement distinguished this tort from that of inducement of breach of con-

tract, where liability may be imposed if the inducer's motive was simply to benefit himself, with the indirect effect of damaging the plaintiff.

Court in *Trau–Med* also included within "improper means" "unethical conduct" described as sharp dealing, overreaching or unfair competition. *Id.*

■ The fifth and final element of the tort is, of course, that plaintiff suffer injury from the tortious interference.

While the Court in *Trau–Med* overruled *Nelson,* we believe the concerns expressed by the Court in *Nelson* remain relevant when defining the parameters of the new tort. Consequently, we must be mindful to avoid unintentional consequences that may serve to negatively impact competition in the marketplace and weaken the contract as a cornerstone of our business community and economy.[4]

When applying the new tort in this case, we will also look to the principles that govern the tort that protects undue interference with contractual relationships. Given the protection and dignity afforded contractual relationships in this state, it would be contrary to sound public policy to inadvertently extend a *greater* protection to relationships where the parties themselves are not bound (non-contractual) or where the existence of the relationship itself is uncertain (prospective relationships). As the Supreme Court noted in *Trau–Med:*

> Economic relationships short of contractual, however, should stand on a different legal footing as far as the potential for tort liability is reckoned. Because ours is a culture firmly wedded to the social rewards of commercial contests,

the law usually takes care to draw lines of legal responsibility in a way that maximizes areas of competition free of legal penalties.

*Trau–Med.,* 71 S.W.3d at 700, *quoting Della Penna v. Toyota Motor Sales,* U.S.A., Inc., 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 750–51 (Cal.1995). Consequently, the Tennessee Supreme Court found that the tort should be recognized in Tennessee, but that its application should still be governed by concerns about interference with legitimate competition.

### III. MOHAWK'S LIABILITY

■ Mohawk appeals the finding that it intentionally and improperly interfered with Watson's relationship with Centex based on privilege, among other grounds. Since we find the privilege issue to be dispositive, we limit our analysis of Mohawk's appeal to that issue. The sole basis of the judgment against Mohawk is Mohawk's refusal to sell the Portico carpet to Watson, which caused Watson's relationship with its customer, Centex, to be disrupted or limited. There is no evidence in the record that Mohawk "poisoned the well" with Centex so that Centex chose not to deal with Watson. On the contrary, the evidence established that Centex wanted to do business with Watson but was unable, at least as to Portico, due to Mohawk's refusal to deal with Watson. The sole basis of Mohawk's interference is its refusal to supply the Portico carpet to Watson,[5] *i.e.,* Mohawk simply refused to

---

4. In addition, it is important to keep in mind that in *Trau–Med* the Court did not apply the new tort to actions of a dealer and a competitor. In the case before us, the defendants are plaintiff's supplier and its competitor.

5. Watson does not allege that Mohawk took any other act to interfere with Watson's relationship with Centex such as disparaging Watson to Centex so Centex would not want

to deal with Watson. The record shows that Centex wanted to buy from Watson and asked Mohawk to sell the Portico carpet to Watson. The damage to Watson's relationship with Centex resulted from Watson's inability to offer Portico carpet to Centex and not the unwillingness of Centex to buy carpet from Watson. During the course of this analysis, this is a important point. Watson points out that during negotiations between Centex and

deal with Watson in this particular brand of carpet. The *act* that caused Watson damage was Mohawk's refusal to deal, not any other action by Mohawk such as defamation, etc. In addition to compensatory damages, Mohawk was assessed $3,750,000 in punitive damages for this decision. Mohawk argues that a simple refusal to deal does not create liability, citing the RESTATEMENT OF TORTS, Tennessee decisions, and caselaw from other jurisdictions.

Our Supreme Court's decisions in *Nelson* and *Trau–Med* evidence a concern that, while protecting existing and prospective business relationships, the tort should not be interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in competition. The Court in *Trau–Med* repeatedly stated it was willing to recognize the tort only where an impropriety existed. The Court in *Nelson* expressed grave concerns regarding the tort's potential damaging effects on free competition. A person is not free to compete if a refusal to do business incurs civil liability. The elements of the tort should not be interpreted or applied in a way that converts the tort into one for a "wrongful decision not to contract." Allowing such a result is contrary to common sense and sound public policy. The Court in *Trau–Med* was willing to recognize the tort only because it required "proof of improper conduct extending beyond the bounds of doing business in a freely competitive economy." Simply refusing to do

business with an entity does not extend beyond the bounds of doing business. Therefore, we conclude that an unwillingness to deal with a person or entity for any reason not independently unlawful is not "improper."

The business relationship Watson seeks to protect is Watson's prospective or existing business relationship to sell carpet to Centex. As discussed earlier, under the first element of the tort, a business relationship involving sales is protected by the tort. Where we draw our distinction is under the fourth element of the tort that requires Mohawk to have acted improperly before liability can attach. We find a supplier has a privilege that allows it to refuse to sell and that such a refusal to deal is not improper.

It is a principle of long standing in Tennessee that the "general rule [is] that a person engaged in business may, at his election, and without good reason, refuse to deal with some other person." *Crumley v. Watauga Water, Co.,* 99 Tenn. 420, 41 S.W. 1058, 1059 (1897), *accord Harrell v. Dean Food Co.,* 619 S.W.2d 528, 533 (Tenn. Ct.App.1981). In other words, in Tennessee, a person has the freedom or unfettered discretion to do business or not to do business with whomever he or she chooses for any reason that does not violate the law.[6]

Mohawk cites a provision from RESTATEMENT (FIRST) OF TORTS, § 762 (1939) that

Mohawk, Mohawk representatives told Centex that Portico carpet would be made available to Watson. According to Watson, this is an effort by Mohawk to use misrepresentation to interfere with Watson's relationship with Centex. The crux of the damage is, nevertheless, the same, *i.e.*, the refusal to supply Watson the carpet. The misrepresentation was not an allegation against Watson such as would cause Centex not to want to do business with Watson. While some tenuous argument might be made that had Centex known of

Mohawk's refusal to sell to Watson then Centex might not have entered into the exclusive agreement, this is speculative at best and, had Centex found this to be an important part of its agreement with Mohawk, presumably Centex would have wanted the requirement that Mohawk supply Watson to be a part of its exclusive agreement.

6. No impermissible or independently unlawful reason is alleged herein.

serves to support the position that intentional interference with prospective business relationships was not intended to adversely affect the freedom to do business with whomever one elects.

> One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not: (a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or (b) a means of accomplishing an illegal effect on competition, or (c) part of a concerted refusal by a combination of persons of which he is a member.

This section was dropped from the RESTATEMENT (SECOND) OF TORTS. However, as an introductory note explains, § 762 was not deleted because it was no longer considered a statement of the law. Instead, § 762 was deleted because it was deemed to pertain to trade regulation and not torts.

> Section 762 dealt with the Privilege of Selecting Persons for Business Relations … It is clear that these topics are all within the general field of Trade Regulation rather than Torts, and that the principles and policies involved are primarily those concerned with governmental regulation of business. The decision has therefore been made to delete them, too.

Introductory Note, Div. 9 Interference with Advantageous Economic Relations, RESTATEMENT (SECOND) OF TORTS.

The RESTATEMENT (SECOND) OF TORTS states that there are "a number of established privileges" for the tort of interference with prospective business relationships. The privilege discussed in § 762 is one such privilege, established in Tennessee law, and it applies herein to Mohawk.

Courts in other jurisdictions have recognized the continued viability of § 762 in the context of interference with business relationship claims. *See Van Natta Mechanical Corp. v. Di Staulo,* 277 N.J.Super. 175, 649 A.2d 399 (1994); *Circo v. Spanish Gardens Food Manufacturing Co.,* 643 F.Supp. 51 (W.D.Mo.1985).

It should also be noted that while discussing intentional interference with performance of a contract by a third person, comment b to § 766 of the RESTATEMENT (SECOND) OF TORTS provides as follows:

> The rule stated in this Section does not apply to a mere refusal to deal. Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability.

This privilege not to enter into contracts must also apply to non-contractual business relationships. Claims based on the two torts are often inextricable because it is difficult, if not impossible, to know whether a business relationship will be "consummated" by a contract or not. Therefore, this privilege must exist for contractual and non-contractual business relationships alike. Any other result has no logical basis in view of the law's preferential treatment of contractual relationships.

We conclude that Mohawk cannot be held liable for simply declining to sell specific carpet to Watson. Its decisions on what companies to deal with and what to sell them are privileged. Consequently, the judgment against Mohawk for interference with Watson's relationship with Centex is reversed.

 Additionally, because Mohawk cannot be liable for simply refusing to sell Portico to Watson, it cannot be liable for conspiring to refuse to sell. A conspiracy is not actionable where the thing itself is

privileged. *Forrester v. Stockstill,* 869 S.W.2d 328, 330 (Tenn.1994); *Felts v. Paradise,* 178 Tenn. 421, 158 S.W.2d 727, 729 (1942). Civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Freeman Management Corporation v. Shurgard Storage Centers, LLC,* 461 F.Supp.2d at 642, *citing Morgan v. Brush Wellman, Inc.,* 165 F.Supp.2d 704, 721 (E.D.Tenn. 2001); *Tenn. Publ'g Co. v. Fitzhugh,* 52 S.W.2d 157, 158 (Tenn. 1932). *See also, Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983)("Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").

Consequently, the judgment against Mohawk for conspiracy must also be reversed. The awards of both compensatory and punitive damages against Mohawk are reversed.

## IV. LIABILITY OF CARPET DEN AND ITS OWNER

While Mohawk was a supplier to Watson, Carpet Den and its owner, Rick McCormick (referred to collectively as "Carpet Den") are competitors of Watson. At trial, Carpet Den was found liable for tortiously interfering with one of Watson's business relationships and for conspiring to interfere with the other. First, Watson recovered against Carpet Den on the ground that Carpet Den intentionally interfered with Watson's business relationship with Mohawk. Since Mohawk would not sell the Portico carpet to Watson, Watson lost Centex as a commercial customer on the projects that required Portico carpet. However, the jury specifically found

that neither Carpet Den nor Mr. McCormick intentionally interfered with Watson's business relationship with Centex. Second, Carpet Den was also found liable for civil conspiracy on the basis that Carpet Den conspired with Mohawk to interfere with Watson's relationship with Centex.

On appeal, Carpet Den argues that as a matter of law it did not tortiously interfere with or conspire to interfere with either relationship and seeks reversal based on several grounds. We begin with the arguments relating to the retroactive application of the *Trau–Med* decision. Carpet Den argues that *Trau–Med* should not be applied retroactively and that Carpet Den enjoyed a competitor's privilege under the law as it existed prior to the *Trau–Med* decision. Carpet Den also argues against application of *Trau–Med* as one of its grounds for reversing the finding that it conspired with Mohawk to interfere with Watson's relationship with its customer Centex.[7]

## A. Retroactivity of *Trau–Med* and Competitor's Privilege

 The decisions and actions taken by the defendants herein all occurred in 1998, four years before *Trau–Med* overruled *Nelson* and recognized the existence of the tort of interference with business relationships in Tennessee. According to Carpet Den, it is error to apply the *Trau–Med* decision retroactively.

 As a preliminary matter, the applicability of *Trau–Med* to this case has already been decided in this case. In the Opinion on Petition to Rehear, the Court of Appeals remanded the case "for trial in accordance with the directives of the Supreme Court in *Trau–Med.*" *Watson's*

---

**7.** Mohawk also argued that *Trau–Med* should not be applied to this case. Since we decided Mohawk's liability on the dispositive issue of

dealer's privilege, we did not discuss the retroactive application of *Trau–Med* in that portion of this opinion.

*Carpet,* 2002 WL 562577, at *1. The Supreme Court denied a Tenn. R.App. P. 11 application for permission to appeal from that order. Under the law of the case doctrine, "an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board,* 975 S.W.2d 303, 306 (Tenn.1998). The exceptions to this doctrine are quite restrictive. An issue that was decided in a prior appeal may be reconsidered only if (1) the evidence offered after remand is substantially different from evidence in the initial proceeding, (2) the prior ruling is clearly erroneous and would result in manifest injustice if allowed to stand, or (3) the prior decision is contrary to a change in controlling law that occurred between the first and second appeal. *Id.* None of these exceptions apply. The issue of the applicability of *Trau–Med* was decided earlier by this court, the Tennessee Supreme Court declined to review that decision, and the parties are precluded from relitigating it at this point.

 Even if the issue had not been definitively decided earlier in this case, we would still find that *Trau–Med* must be applied herein. As counsel for Carpet Den concede, as a general rule judicial decisions are applied retroactively.

In civil cases, judicial decisions overruling prior cases generally are given retrospective effect. *See, e.g., Perez v. McConkey,* 872 S.W.2d 897, 906 (Tenn. 1994) (applying abolition of assumption of the risk doctrine retroactively); *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.,* 846 S.W.2d 810, 812 (Tenn. 1993) (further describing proper retroactive application of *McIntyre* ); *McIntyre*

*v. Balentine,* 833 S.W.2d 52, 58 (Tenn. 1992) (applying comparative fault doctrine retroactively). Retrospective effect will be "denied only if such an application would work a hardship upon those who have justifiably relied upon the old precedent." *Marshall v. Marshall,* 670 S.W.2d 213, 215 (Tenn.1984); *see generally,* S.R. Shapiro, Annotation, *Prospective or Retroactive Operation of Overruling Decision,* 10 A.L.R.3d 1371 (1966).

*Hill v. City of Germantown,* 31 S.W.3d 234, 239 (Tenn.2000). Other rules apply where the judicial decision at issue overrules a prior judicial construction of a statute, *id.* at 239–40, but the case before us does not involve a statute or its interpretation by the courts.

As the Court noted in *Marshall v. Marshall, supra,* "prospective only" application of an overruling decision should be limited to a case where hardship on a party who has relied on the old rule outweighs the hardship on the party denied the benefit of the new rule, and

> Since there are few cases where such rigorous demonstrations can be made, there should be few occasions when prospective overruling can justifiably replace the normal retroactive application of the overruling decision.

*Marshall,* 670 S.W.2d at 215, *quoting* Traynor, *Quo Vadis Prospective Overruling: A Question of Judicial Responsibility,* 28 Hastings L.J. 533, 561–62 (1977).

In a decision predating *Marshall* by approximately nine months, the Tennessee Supreme Court considered a motion to rehear requesting that it make its ruling on the merits apply prospectively only. *Luna v. Clayton,* 655 S.W.2d 893 (Tenn. 1983). The Court first noted that the United States Supreme Court had held in *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145,

77 L.Ed. 360 (1932), that state courts could constitutionally choose to apply a state court decision departing from established precedent in either a retroactive or prospective manner. The *Luna* court also stated that since *Sunburst*, the United States Supreme Court had adopted "a posture of non-retroactivity" only where three conditions are present: (1) the decision at issue establishes a new principle of law by overruling clear past precedent, (2) retroactive application will retard its prospective application, *and* (3) retroactive application could produce substantial inequitable results to the instant litigants. *Luna*, 655 S.W.2d at 989–900. *Accord, Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516 (Tenn.1977). In *Luna*, the court found that its decision overruling prior precedent was "not the type that requires pure non-retroactive application of the rule in question" and adopted a "pipeline approach," applying its change from prior precedent to the litigants at bar and to those cases that had been filed and in which final judgment had not been rendered on the date of the release of the decision.[8] *Id.*, 655 S.W.2d at 900.

Whether we apply the factors set out in *Luna*[9] or the later distillation of those factors as espoused in *Marshall*, we find that Carpet Den has not established any basis for departing from the general rule of retroactive application. Any hardship alleged to have been suffered by Carpet Den provides no greater justification for "prospective only" application of *Trau–Med* than that suffered by other defendants in the cases in which decisions have been applied retrospectively. The holding reversing *Nelson* in *Trau–Med* was applied to the parties in that case, the plaintiffs' claims were held to state a claim for tortious interference with a business relationship, and the case was remanded to the trial court for further proceedings. *Trau–Med*, 71 S.W.3d at 705. We conclude that the trial court properly applied the *Trau–Med* holding to this case.

As part of its retroactivity argument, Carpet Den argues that prior to *Trau–Med*, there existed in Tennessee a privilege that insulated competitors from liability for business torts. Carpet Den initially appeared to concede that this privilege did not survive *Trau–Med* and to argue that *Trau–Med* should not apply retroactively and, therefore, the competitor's privilege would still apply. However, Carpet Den also argues that the competitor's privilege survived *Trau–Med*. We agree and do not believe that *Trau–Med* extinguished the competitor's privilege.

Whether and to what extent a competitor's privilege survived *Trau–Med* is relevant to the fourth element of the tort of intentional interference with business relationships, *i.e.*, the requirement that a tortfeasor have "improper motive" **or** use "improper means."

Carpet Den cites Tennessee cases decided before *Trau–Med* for the proposition that a competitor has the "privilege of interfering to acquire the business for himself." *Polk and Sullivan, Inc. v. United Cities Gas, Co.*, 783 S.W.2d 538, 543 (Tenn. 1989).

---

**8.** When the *Trau–Med* decision was released, the judgment in the case before us was apparently not final, because a petition to rehear was granted.

**9.** There is no doubt that the first factor of *Luna* is present, *i.e.* that *Trau–Med* overruled the clear precedent of *Nelson* thereby creating a new cause of action. Counsel for Carpet Den concede that the second factor, whether retroactive application will retard its prospective application, is "neutral." In other words, retroactive application of the decision in *Trau–Med* does not retard its prospective application. All three conditions must be present for non-retroactivity to be available.

As the Sixth Circuit recently stated in *Warde v. Kaiser*, 887 F.2d 97 (6th Cir. 1989) citing *Prosser and Keeton on Torts* (5th ed.1984) " '[t]he policy of the common law has always been in favor of free competition, *id.* at 1012,' Prosser and Keeton say there is 'no doubt' that a competitor **may** interfere for the purpose of acquiring the business for himself:

'Where the contract interfered with is terminable at will ... the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business that a customer will continue to do business with it. **With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself.' "**

*Polk and Sullivan*, 783 S.W.2d at 543 (emphasis in original).

The Supreme Court in *Polk and Sullivan* cited § 768(1) of the RESTATEMENT (SECOND) OF TORTS that provides as follows:

One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor **does not employ wrongful means** and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

783 S.W.2d at 543 (emphasis added).

As discussed earlier, the fourth element of the tort of interference with existing or prospective business relationships requires either improper motive or improper means. The earlier Tennessee caselaw and the Restatement indicate that a competitor who interferes with another's business relationship in an effort to gain business for itself enjoys a privilege as to the "improper motive" alternative. Clearly, it is not improper for a business to act with the intent of securing business for itself, even though the result is the loss of that business by a competitor. Whether the competitive motive is cast in terms of self-interest or in terms of lessening the competition's success is, arguably, purely semantics.

However, in *Trau–Med*, the Court stated that, in order to show that defendant had an "improper motive," the plaintiff must prove that defendant's "predominant purpose was to injure plaintiff." *Trau–Med*, 71 S.W.3d at 701 n. 5. In the situation where the alleged interfering party is a competitor (unlike in *Trau–Med*), the determination of "predominant purpose" may be difficult. When two competitors are competing over the same business, separating the interest in improving one's own business and taking business away from the competitor would seem problematic.

The "predominant purpose" language in *Trau–Med* could be read as indicating that a competitor who not only wants to secure the business for itself but also wants to injure the competitor (logically, in some way additional to the loss of the business over which they are competing) may be held liable for wrongful interference, depending on which motive predominates.

In *Trau–Med*, the Court was not called upon to consider application of this standard in the context of competitors seeking the same business. Nor was the survival or application of the competitor's privilege at issue in that case. Based on the law cited above, we think the Tennessee Supreme Court, faced with the direct question, would hold that a competitor enjoys a privilege as to the improper motive requirement of the fourth element of the tort of intentional interference with business relationships.

However, we need not attempt to reconcile the *Trau–Med* statement with the competitor's privilege based on the facts in this case. That is because either improper motive or improper means may support liability for tortious interference. Thus, even if a competitor enjoys a privilege that negates the improper motive requirement, it is not insulated from liability if the other requirement is present, *i.e.,* improper means. The Restatement recognized this distinction in § 768(1), quoted above, by providing no protection to a competitor under subsection (b) who uses "wrongful means." Rephrased, a competitor may be liable for damages under § 768(1) of the Restatement if it uses "improper means," regardless of the motive.

### B. Carpet Den Liability for Interference with Watson's Relationship with Mohawk

At this point in the discussion, it is important to point out again that the jury specifically declined to find Carpet Den liable for interfering with Watson's relationship with Centex. Therefore, as to the

interference with business relationships judgment (as distinguished from the conspiracy judgment), the only relationship at issue is Watson's relationship with Mohawk.

Applying the principles discussed above to the case before us, we find that regardless of whether Carpet Den's intent to take business away from Watson for itself or Carpet Den's intent to injure Watson were predominant, and, therefore, whether improper motive was shown, Carpet Den may still be liable for tortious conduct if it used improper or wrongful means in interfering with Watson's relationship with Mohawk.

Watson presented the jury with proof that Carpet Den and Mr. McCormick used improper means to interfere with Watson's relationship with Mohawk causing Mohawk to cut off or limit its dealings with Watson. The jury heard evidence that Mr. McCormick made untrue defamatory statements about Watson's president to a representative of Mohawk, including that Mr. Watson dealt and used illegal substances, was in the mob, cheated his customers, slept with employees, and was having financial difficulties including problems with the IRS.[10] While a business may be motivated by a desire to outperform a competitor or successfully obtain business both were seeking, using improper means, like defamation, to do so meets the required fourth element of the tort.[11]

There is material evidence in the record to support the jury's finding that Carpet Den tortiously interfered with Watson's business relationships.[12] The com-

---

10. The appellants' brief also recounted alleged defamatory comments by Mohawk's representative who was a friend of Mr. McCormick.

11. Watson points to evidence that Carpet Den lowered its prices when competing against

Watson and that Carpet Den's owner wanted to put Watson out of business. Such tactics and sentiment are not "improper."

12. Carpet Den alleges that the trial court erred in permitting testimony from four individuals about defamatory remarks by Carpet

petitor's privilege does not apply to prevent liability based on wrongful means, methods, or conduct.

As a separate defense, based on a different privilege, Carpet Den argues that it cannot be held liable for interfering with Watson's relationship with Mohawk since Mohawk had a dealer's privilege not to deal with Watson, but cites no authority from any jurisdiction to support this position.

It is not a prerequisite of liability that the third party (herein Mohawk) have any obligation whatsoever to the injured party in order for a tortfeasor to be liable for interfering with the potential relationship. The tort of intentional interference with business relationship always involves the protection of a voluntary relationship. It must be remembered that this tort protects non-contractual relationships, existing or prospective. Just because Mohawk may choose to deal or not to deal with Watson does not remove that relationship from the tort's protection. As discussed earlier, the first element of the tort is met if there is a "prospective relationship" with identifiable third parties. The fact that Mohawk had no obligation to deal with Watson does not present a defense to Carpet Den on the allegation that Carpet Den tortiously interfered with the voluntary relationship. *Trau–Med*, 71 S.W.3d at 701.

Since we have rejected all the grounds raised by Carpet Den appealing the finding that it tortiously interfered with Wat-

son's relationship with Mohawk, the judgment against Carpet Den for tortiously interfering with Watson's relationship with Mohawk is affirmed.

## C. Carpet Den Liability for Conspiring with Mohawk to Interfere with Watson's Relationship With Centex

Carpet Den appeals the jury's finding that it conspired with Mohawk to interfere with Watson's relationship with its customer Centex on three grounds: [13]

i.) Since Mohawk is not liable for refusing to deal with Watson, then it cannot participate in a conspiracy with Carpet Den and its owner to refuse to deal with Watson;

ii.) The jury form finding Carpet Den not liable for interfering with Watson's relationship with Centex but finding it liable for conspiring with Mohawk to interfere was inconsistent;

iii.) The jury instructions regarding civil conspiracy were defective.

Carpet Den argues that since Mohawk enjoyed a privilege as a supplier to refuse to sell to Watson, Mohawk could not conspire with Carpet Den in an action for civil conspiracy based on Mohawk's refusal to sell to Carpet Den. In other words, since it takes at least two entities to comprise a conspiracy and Mohawk was not acting tortiously, then Carpet Den could not conspire alone.[14] In *Trau–Med*, our

Den's owner about Mr. Watson. On this alleged ground of error, we find the trial court did not err in allowing the witnesses to testify about the defamatory remarks made by Mr. McCormick about Watson. Whether Carpet Den used improper means was a relevant line of inquiry.

13. As defenses to conspiracy liability, Carpet Den also again asserted the prospective application of *Trau–Med* and the competitor's priv-

ilege arguments we have already discussed and decided.

14. As to Mr. McCormick and Carpet Den, since Mr. McCormick was acting as the agent of Carpet Den, then for the purpose of civil conspiracy, they are treated as a single entity. See *Trau–Med*, 71 S.W.3d at 703. Watson does not challenge that, for purposes of civil conspiracy, Carpet Den and its owner are considered a single entity.

Supreme Court defined civil conspiracy as follows:

> An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff.

71 S.W.3d at 703.

■■■ It is important to note at this juncture that the fact that a conspiracy exists does not, in and of itself, create a cause of action. A civil conspiracy is an intentional tort that requires damage to the plaintiff before it is actionable. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32 (Tenn.Ct.App.2006). In this case, the damage inflicted on Watson was loss of the Centex business due to Mohawk's refusal to sell Portico carpet to Watson because of its exclusive relationship with Carpet Den for that product.

The fact that it was not tortious for Mohawk to refuse to sell to Watson has consequences on the civil conspiracy claim. Since two entities are required for a conspiracy and Mohawk exercised a privilege not to deal with Watson, then Carpet Den could not conspire with Mohawk to do what Mohawk was legally entitled to do. In other words, Carpet Den cannot be held liable for helping Mohawk act legally.[15] It is established that "it cannot be that a conspiracy to do a thing is actionable where the thing itself would not be." *Forrester*, 869 S.W.2d at 330, *citing*, *Felts v. Paradise*, 178 Tenn. 421, 158 S.W.2d 727, 729 (1942); *accord, Strategic Capital Resources, Inc. v. Dylan Tire Industries*, 102 S.W.3d 603, 610 (Tenn.Ct.App.2002).

Civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Freeman Management Corporation v. Shurgard Storage Centers, LLC*, 461 F.Supp.2d at 642. *See also, Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983) ("Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort"). Because Mohawk's refusal to sell Portico carpet to Watson was not a tortious act, there was no basis for liability for conspiracy. Since Mohawk could lawfully refuse to deal with Watson, Carpet Den could not be liable for conspiring with Mohawk to do what Mohawk was entitled to do.[16]

For this reason, as a matter of law, Carpet Den and Mr. McCormick cannot be found liable for civil conspiracy. It is not necessary for us to discuss the other grounds raised by Carpet Den seeking reversal of the civil conspiracy claim.

## CONCLUSION

The judgment against Mohawk is reversed. The judgment against Carpet Den and Rick McCormick for civil conspiracy is reversed. The judgment against Carpet Den and Rick McCormick for tortiously interfering with Watson's business relationship with Mohawk is affirmed.

Costs of this appeal are taxed equally between the Appellants, Rick McCormick and Carpet Den, Inc., and Appellee, Wat-

---

**15.** This is distinct from Carpet Den acting wrongfully, *i.e.* defaming Watson, in order to get Mohawk to refuse to deal with Watson as to certain carpet.

**16.** This result might be quite different if the wrongful act complained of was unrelated to Mohawk's privilege to deal.

son's Carpet and Floor Coverings, Inc., for which execution may issue if necessary.