NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0116n.06

Case No. 24-5892

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Feb 27, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| SAMUEL JOHNSON, | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE MIDDLE DISTRICT OF |
| UNIVERSITY HOSPITALS HEALTH | ) | TENNESSEE |
| SYSTEM, INC., | ) | |
| Defendant-Appellee. | ) | OPINION |
|  | ) | |

Before: SUTTON, Chief Judge; COLE and THAPAR, Circuit Judges.

SUTTON, C.J., delivered the opinion of the court in which COLE and THAPAR, JJ., concurred. COLE, J. (pg. 9), delivered a separate concurring opinion.

SUTTON, Chief Judge. VisuWell, a telehealth company, fired its chief executive officer, Samuel Johnson, after a video of Johnson confronting prom-going teenagers at a Tennessee hotel went viral. Rather than sue his former employer, Johnson sued one of its customers, Ohio-based University Hospitals. He alleges that University Hospitals tortiously interfered with his employment by pressuring VisuWell to fire him. The district court granted University Hospitals' motion for summary judgment. We affirm.

I.

On April 24, 2021, Samuel Johnson sat down for dinner at a hotel restaurant. Shortly after, a group of teenagers began taking prom pictures nearby. The group apparently became "[r]owdy"

and "loud," prompting Johnson to ask a chaperone to settle them down. R.82-2 at 17. One of the teenage boys, who was wearing a red prom dress, confronted Johnson after the two made eye contact. Shortly thereafter, the teen's boyfriend started filming the rest of their interaction. The video captures the boyfriend trying to goad Johnson into reacting negatively to the teen's red dress and Johnson telling the teen that he "look[s] like an idiot." R.82-2 at 28; Kathy Griffin (@kathygriffin), *X* (Apr. 26, 2021, 1:45 AM), https://x.com/kathygriffin/status /1386556994560020481?s. After Johnson and the teens parted ways, Johnson left the hotel to eat dinner somewhere else.

The boyfriend posted the video on the internet that evening, and it found a broad audience. By the next morning, April 25, Johnson's wife and daughter had watched the video online while vacationing several states away. Actress Kathy Griffin saw it, and shared it with two million Twitter followers in a post that identified Johnson as VisuWell's CEO. (Johnson sued Kathy Griffin in a separate case. *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023).) The video separately caught the attention of VisuWell after someone messaged VisuWell's president and chief operating officer on LinkedIn the day after the encounter.

The wide distribution of the video and its contents stoked concern among VisuWell's board of directors. One director found Johnson's behavior "offensive and not becoming of someone in [Johnson's] position." R.80-3 at 5. Others were "disappointed" and concerned "that this would reflect poorly on the company." R.80-7 at 3. The company's chairman called Johnson on April 25 and expressed his unease about the video but assured him that his job was safe. The next morning, the directors discovered that Johnson had spoken to the press, despite their order not to, and placed him on administrative leave. Meanwhile, the directors continued to assess the public relations issues caused by the video and, in doing so, spoke to their major customers.

One such customer was University Hospitals. A month earlier, the Ohio hospital system had enlisted VisuWell, a telehealth company, to expand its remote healthcare offerings to meet rising demand for the services. University Hospitals soon became VisuWell's largest customer. As the video gained more online views, University Hospitals received "a lot" of messages expressing "disappoint[ment]" that it worked with Johnson and demanding to know its response to the video. R.80-13 at 4–5. The hospital arranged a call with VisuWell on April 26. At that point, VisuWell had already placed Johnson on administrative leave.

During the call, Johnson and University Hospitals agree that University Hospitals conveyed that it was "frustrat[ed]," "ask[ed] what [VisuWell's] response was going to be," and requested that VisuWell "respon[d] as quickly as possible." R.82-9 at 13. Beyond that, their accounts diverge.

Johnson alleges that University Hospitals pressured VisuWell to fire Johnson and threatened to end its contract with VisuWell if it did not. He points to the testimony of a University Hospitals executive on the call, who described the conversation as "validating that [Johnson] would not have an ability to influence the forward path for VisuWell." R.82-3 at 23–24. An executive from VisuWell shared the same "impression[]" that University Hospitals wanted VisuWell to "address" the "cultur[al]" problems created by Johnson's leadership. R.82-9 at 14. Johnson also points to an email by University Hospitals' CEO, who was not on the call, stating that the University Hospitals executives who spoke to VisuWell said they would "sever[] ties" "if [they] didn't hear [Johnson was] gone publicly by the end of the day." R.80-28 at 2. Further confirmation of his perspective, Johnson says, comes from a tweet by University Hospitals a few hours after the call that it was "evaluating [its] business relationship with VisuWell." R.80-16 at 2.

University Hospitals denies threatening to end its contract with VisuWell if Johnson remained CEO. All six VisuWell and University Hospitals employees who participated in the call, it explains, said they neither heard nor said any such thing. Nor were VisuWell's directors aware of University Hospitals' tweet.

A few hours after its call with University Hospitals, VisuWell's directors voted to fire Johnson and called him to deliver the news. That same day, VisuWell sent a draft public statement announcing the decision to several customers, including University Hospitals. According to one University Hospitals executive, the statement was "[e]xactly as expected." R.82-21 at 2. VisuWell released the statement.

The next day, April 27, a University Hospitals executive called VisuWell, this time to confirm that Johnson was "not involved with the company any longer." R.82-8 at 33. University Hospitals wrote on its Twitter account that VisuWell "stepped up to do the right thing" by firing Johnson. R.80-27 at 4.

Johnson sued University Hospitals, but not VisuWell, in federal court four months later. He alleged that, by demanding that VisuWell fire him, University Hospitals tortiously interfered with his employment contract with VisuWell under Tennessee statutory and common law and tortiously interfered with his employment relationship under Tennessee common law. The district court granted summary judgment to University Hospitals. Johnson appeals.

II.

We give fresh review to the district court's summary judgment decision on Johnson's claims and draw all reasonable factual inferences in Johnson's favor. *See* Fed. R. Civ. P. 56(a); *Peffer v. Stephens*, 880 F.3d 256, 260, 262 (6th Cir. 2018).

A.

*Tortious interference with contract.* Tennessee law recognizes common law and statutory claims for tortious interference with contract. *See* Tenn. Code Ann. § 47-50-109; *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542–43 (Tenn. 1989). The two claims share the same elements. *Polk & Sullivan*, 783 S.W.2d at 543. To succeed on both, Johnson must prove that he had an employment contract with VisuWell, that University Hospitals knew of the contract and maliciously intended to induce VisuWell to breach it, and that University Hospitals proximately caused VisuWell to breach the contract, injuring Johnson. *See id.*

Johnson's claims fail for a basic reason. VisuWell did not breach any contract when it fired him, and no liability for inducing a breach arises in the absence of an underlying breach. Johnson's employment contract gave VisuWell the right to fire him with or without cause. That meant that he had "no contractual right to continued employment" and served only while VisuWell willed it. *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994). And it meant that VisuWell did not, indeed could not, breach the contract by firing Johnson, no matter its reason. That explains why Johnson never challenges VisuWell's decision to discharge him under the contract.

Johnson resists this conclusion in several ways. He insists that a breach occurs so long as a party ends the contract, even if it does so according to its terms. But the cases he invokes all concern tortious interference with an *employment relationship*, a distinct tort that covers interference with non-contractual employment arrangements. *See id.*; *Fitzgerald v. Abbott*, No. M2008-00920-COA-R3-CV, 2009 WL 304421, at *2 (Tenn. Ct. App. Feb. 5, 2009); *Hill v. Gannon*, No. M2015-00528-COA-R3-CV, 2016 WL 1608701, at *4 (Tenn. Ct. App. Apr. 18, 2016). While claims for employment-relationship interference do not require an underlying contract violation, and do not require any employment contract at all, his contract-interference

claims do. "A fundamental requirement" for contract-inference claims, the Tennessee courts have explained, "is an actual breach," which occurs when a party to the contract "terminate[s] [it] wrongly." *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 290 (Tenn. Ct. App. 1995). Regrettably for Johnson, he cannot satisfy that requirement.

Johnson persists that contract-interference claims require a contract violation only when the interfering party *competes* with a contracting party. Because University Hospitals does not compete with VisuWell, he explains, he need not show that VisuWell violated his contract when it fired him. But in truth all contract-interference claims, no matter whether the alleged interferer is a competitor or not, require proof of a contract violation. *Forrester v. Stockstill* makes the point. The alleged interferer in that case did not compete with the party that ended the employment contract, yet the Tennessee Supreme Court asked whether the contract had been violated all the same. 869 S.W.2d at 330. Because the employee there could be fired with or without cause under the contract, as with Johnson, the court held that the employer did not violate the contract by firing him. *Id.*

Johnson raises the concern that requiring a contract violation will make "the tort of tortious interference . . . essentially unavailable in the employment context." Appellant's Br. 42. Johnson and other employees like him, it is true, may not recover for interference with employment contracts if they have an at-will relationship with their employer. But Tennessee law does not leave them without recourse. They may instead claim tortious interference with their *employment relationships*, which does not require a contractual breach. *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977). Johnson understands the distinction, as he filed a separate claim for interference with an employment relationship. We turn to that claim now.

B.

*Tortious interference with an employment relationship.* To succeed on this claim, Johnson must show that University Hospitals "intentionally and without justification procured [his] discharge." *Id.* Among other things, that requires Johnson to show that University Hospitals harbored an "improper motive" or used "improper means." *Trau-Med of Am., Inc. v. Allstate Ins.*, 71 S.W.3d 691, 701 (Tenn. 2002).

The problem for Johnson is that he cannot show that University Hospitals acted with an improper motive or means, even assuming that it procured his discharge by threatening to cut ties with VisuWell. Nothing about the alleged threat meets the Tennessee courts' definition of what counts as "improper." *Id.* at 701 n.5. No evidence suggests that University Hospitals acted for the "predominant purpose" of injuring Johnson. *Id.* The uncontradicted record shows that University Hospitals sought to protect its business from rising public criticism. That motive, falling within the "bounds of doing business," was proper. *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 178 (Tenn. Ct. App. 2007).

Nor did University Hospitals act on a permissible motive through impermissible means. The alleged threat was not "illegal," "independently tortious," or "unethical." *Trau-Med*, 71 S.W.3d at 701 n.5. University Hospitals' contract with VisuWell gave it the right to do precisely what it allegedly threatened to do: cease doing business with VisuWell "for any reason or no reason." R.80-15 at 5. Had University Hospitals invoked that right, Johnson could not have objected. *See BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1064–65 (6th Cir. 2023).

Johnson contends that he need only show that University Hospitals wanted "to benefit [itself], with the indirect effect of damaging" him to prove that it lacked justification. *Freeman*

7

*Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 640 (M.D. Tenn. 2006). But this easier-to-prove standard applies only to interference claims involving contracts, not non-contractual or at-will employment relationships. *Id.* The difference sensibly reflects the "less[er] protection" afforded by the state to the latter group of arrangements, and the correspondingly higher showing of wrongdoing required to prove actionable interference with them. Dobbs, The Law of Torts § 616 (2d ed. 2024).

Johnson argues that *Trau-Med*, which set out the improper motive or means requirement, does not apply because it concerned a different claim for tortious interference with *business* relationships. 71 S.W.3d at 698. But the Tennessee Supreme Court has not cabined *Trau-Med* in this way. It instead applies the same elements to claims for interference with employment relationships. *See Moore-Pennoyer v. State*, 515 S.W.3d 271, 281 (Tenn. 2017).

We affirm.

COLE, Circuit Judge, concurring. I would also affirm the district court's decision to grant the motion for summary judgment because VisuWell did not breach any contract when it fired Johnson, and Johnson cannot show that University Hospitals acted with an improper motive or means, even assuming it procured his discharge. I write separately only to clarify my view of the dispute's inciting event and its relevance to the dispositive issues on appeal.

Based on the record, Johnson encountered a group of boisterous teenagers taking prom pictures, including a young man in a red prom dress. (R. 82-2, PageID 707–08.) One of the teenagers filmed a portion of that encounter and posted it online. (*Id.* at 718–19.) The short video, which does not capture the entire incident, depicts Johnson following the young man and saying that he "look[s] like an idiot." (R. 82-36, 0:00:09–0:00:18.) The young man tells Johnson to get away from him, while bystanders attempt to intervene and ask Johnson to stop. (*Id.* at 0:00:28–0:00:40.) The video went viral online, prompting the concerns that led VisuWell to terminate Johnson's employment. (R. 80-2, PageID 469–71.)

Viewing the facts in the light depicted by the video, as we must do, undermines certain elements of Johnson's account. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Those disputed facts are not relevant to this appeal.