**ACT FOR HEALTH, d/b/a Professional Case Management, and PCM of Tennessee, Inc., Plaintiffs,**

v.

**CASE MANAGEMENT ASSOCIATES, INC., d/b/a Freedom Care, Defendant.**

No.: 3:12–CV–442–TAV–HBG

United States District Court, E.D. Tennessee, at Knoxville.

Filed 03/17/2014

Jessica Sievert, Waller, Lansden, Dortch & Davis, PLLC, Nashville, TN, Mark B. Wiletsky, Nadya C. Bosch, Holland & Hart, LLP, Boulder, CO, for Plaintiffs.

John E. Winters, Warren Lee Gooch, Kramer, Rayson LLP, Knoxville, TN, for Defendant.

### MEMORANDUM OPINION AND ORDER

Thomas A. Varlan, CHIEF UNITED STATES DISTRICT JUDGE

This civil action is before the Court on two motions: (1) plaintiff Act for Health, doing business as Professional Case Management's ("PCM") Motion for Partial Summary Judgment [Doc. 31]; and (2) defendant Case Management Associates, Inc., doing business as Freedom Care's ("Freedom Care") Motion for Summary Judgment [Doc. 34]. PCM and its wholly owned subsidiary, PCM of Tennessee, Inc. ("PCMT") (collectively, "plaintiffs"),[1] move for summary judgment on the issue of whether Freedom Care is operating unlawfully and on their Tennessee Consumer Protection Act and unfair competition claims against Freedom Care. Freedom Care seeks summary judgment on all of plaintiffs' claims and dismissal of the case.

---

1. Pursuant to Rule 17 of the Federal Rules of Civil Procedure, plaintiff PCMT was added to this case by the Court on February 14, 2014 [Doc. 80]. Although the Court gave Freedom Care the opportunity to submit supplemental briefing in light of the Court's ruling as to its pending summary judgment motion, Freedom Care did not so. Thus, the Court will rule on the motions as they have been briefed. Similarly, although PCMT did not formally adopt the positions of PCM, the Court will presume its position is the same for the purposes of its analysis.

Both parties submitted responses in opposition to the respective motions [Docs. 42, 51], to which both parties submitted replies [Docs. 50, 58]. In addition, both parties submitted supplemental briefing, as well as various exhibits, deposition excerpts, and other evidence in support of their respective positions, all of which the Court has reviewed in light of the prevailing case law. For the reasons discussed herein, the motions [Docs. 31, 34] will be granted in part and denied in part.

## I. Relevant Background

This case arises from plaintiffs' provision of skilled and unskilled in-home care to former weapons site workers under the Energy Employees Occupational Illness Compensation Program Act ("EEOIC-PA"), 42 U.S.C. § 7384, et seq. [Doc. 1 ¶ 7]. PCM, a Colorado-based corporation, has been providing in home health care to EEOICPA patients nationwide since 2002, including patients in Tennessee [Id. ¶¶ 11–12]. PCM serves as an enrolled provider with the Department of Labor, the agency that manages the program, which reimburses PCM for the home health care services it provides. PCMT serves as a licensed home care organization in the State of Tennessee [Id. ¶ 12]. PCM's employees are leased to PCMT for the provision of care.

Plaintiffs allege that all information pertaining to its EEOICPA patients, and the methods for obtaining such patients, are trade secrets. In order protect these and other proprietary information, plaintiffs require their home healthcare providers to execute restrictive covenant agreements [Id. ¶ 16]. Employees agree that they will not provide or attempt to provide home health services to plaintiffs' patients or prospective patients with whom the employee previously had contact [Id. ¶ 17] or attempt to solicit or otherwise recruit any current employee to provide home health services for one year after their separation from the company [Id.].

Plaintiffs allege that Freedom Care has been providing similar in-home health services to EEOICPA patients in Tennessee without the necessary home care organization license and certificate of need required by law [Doc. 1 ¶ 22]. Freedom Care does not have its own home care license or certificate of need, but instead provides home care pursuant to the Personal Services Agreement entered into with Jellico Community Hospital ("Jellico") on February 7, 2012 [Doc. 45]. Under the agreement, Freedom Care provides in-home care to EEOICPA patients using the license and Certificate of Need issued to Jellico, while Jellico oversees Freedom Care [Id.; Doc. 31–4 at 164:24, 166:1214]. Under the agreement, Lisa Hill, a nurse who works for Jellico as a full-time employee, makes bi-weekly visits to Freedom Care's offices, and accompanies one of Freedom Care's employees visit patients [Doc. 31–4 at 166–67]. Freedom Care, however, is responsible for finding patients and administering all treatment to the patients [Id. at 203–05]. Freedom Care also finds the nurses who administer care to EEOICPA patients [Id. at 220:7–11], prepares the billing information for Jellico, and submits invoices to the Department of Labor. Once Jellico receives payment from the Department of Labor, Freedom Care is paid by Jellico for its services [Id. at 205–207].

By providing home health care without proper licensing, plaintiffs allege, Freedom Care has taken several EEOICPA patients away from plaintiffs' care. Because of its presence in a limited market, as highlighted through advertisements and other media, plaintiffs claim that Freedom Care has and will continue to interfere with plaintiffs' position as the main provider of EEOICPA care in the region with both

current and prospective patients unless enjoined from operating [Doc. 1 ¶ 23]. Specifically, plaintiffs claim that Freedom Care interfered with its treatment of at least two patients, referred to as "Patient A" and "Patient B," both of whom were being treated by plaintiffs but who were later treated by Freedom Care.[2] Patient A was a former Department of Energy employee who qualified to receive benefits under the EEOICPA and suffered from chronic beryllium disease and dementia [Doc. 41-2 ¶ 3]. Patient A had been treated by plaintiffs for approximately eighteen months prior to his admission to the hospital on June 13, 2012, although plaintiffs had not been getting reimbursed for this care because Patient A's treatment had not yet been authorized by the Department of Labor [Doc. 41-1 at 107–08]. Plaintiffs had made the family aware of this fact prior to Patient A's admission to the hospital [Doc. 51–11 at 3:2–6]. During the course of his hospital stay, plaintiffs discharged Patient A so that he could be placed in a nursing home while plaintiffs received authorization. Plaintiffs did not provide additional care to Patient A upon his release, although several employees testified that plaintiffs planned on resuming care once it received authorization, and that its case managers were in communication with Patient A's family [Doc. 41-1 at 23–26; 107–108]. After two weeks of providing care on their own, Patient A's daughter-in-law, Charlotte Williams, called Freedom Care to learn about their services, as she had been informed of them by Freedom Care advertisements and one of Patient A's previous nurses [Doc. 41-2 at 3 ¶ 10]. Freedom Care agreed to provide care to Patient A, and soon thereafter hired PCM's employees who had previously provided care to Patient A to continue to provide that care as employees for Freedom Health [Doc. 57 at 2 ¶ 9].

Similarly, Patient B is a former government contractor, EEOICPA eligible, who suffers from Parkinson's disease and neuropathy, among other ailments [Doc. 41–3 at 1 ¶ 2]. While under plaintiffs' care, Patient B learned about Freedom Care's services from his massage therapist, who informed him that Freedom Care provided in-home medical treatment and homemaker services, which plaintiffs did not offer at the time [Id. at 2 ¶¶ 3, 6]. Based upon his massage therapist's recommendation, Patient B contacted Freedom Care and subsequently requested that they provide medical care and home services care to him [Id. at 2 ¶¶ 5, 7].[3]

PCM commenced this action on August 22, 2012, alleging claims for tortious interference with contractual or business relations as to Patient A, Patient B, and prospective patients, tortious inducement to breach, violations of the Tennessee Consumer Protection Act Tenn.Code Ann. § 47–18–101, et seq. ("TCPA"), common law unfair competition, and a violation of Tenn.Code Ann. § 68–11–229, which prohibits home care organizations from soliciting patients to change home care organizations. Plaintiffs seek damages as well as injunctive relief to prohibit Freedom Care from operating without its own license and Certificate of Need.

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is

---

2. The patients' true names have been redacted or otherwise filed under seal.

3. In addition to claims about Freedom Care taking patients, plaintiffs claim that Freedom Care has induced several nurses, including those who provided care to Patient A, to breach their agreements by recruiting them to work for Freedom Care, in an effort to incentivize patients to follow their nurses to a new home care provider [Doc. 1 ¶ 69].

proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir.2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.,* 778 F.Supp. 1421, 1423 (E.D.Tenn.1991) (citing *Celotex,* 477 U.S. at 317, 106 S.Ct. 2548). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v.*

*J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. Analysis

Plaintiffs submit that summary judgment is proper as to the issue of whether Freedom Care is operating unlawfully, as well as on their claims for a violation of the TCPA and the common law tort of unfair competition. In its motion, Freedom Care asserts that there are no genuine issues of material fact as to any of plaintiffs' claims, as plaintiffs can present no evidence of any improper actions by Freedom Care in regard to its operation nor any evidence of damages sustained by plaintiffs. The Court will first address the issue of whether Freedom Care's arrangement with Jellico is permitted under Tennessee law and the corresponding regulations governing home care service, prior to addressing the parties' arguments with respect to each of plaintiffs' claims.

### A. Whether Freedom Care's Business Arrangement with Jellico is Permitted under Tennessee Law

In support of their motion for partial summary judgment, plaintiffs argue that, since Freedom Care is merely renting the Certificate of Need and home services license from Jellico, Freedom Care is operating in violation of the statutes and Tennessee Department of Health regulations governing the provision of in-home health services. While Jellico provides occasional supervision, plaintiffs argue, there is no dispute that Freedom Care is providing all

of the qualifying home services, as well as procuring patients, hiring nurses, and receiving the majority of the reimbursement received from the Department of Labor. As a result, plaintiffs allege, Jellico has improperly delegated supervisory and administrative duties to Freedom Care, and Freedom Care cannot rely upon Jellico's license and corresponding Certificate of Need in its provision of home health services.

Freedom Care argues in response that Jellico maintains appropriate supervision and control under the Personal Services Agreement and that the applicable regulations otherwise permit the arrangement between Jellico and Freedom Care. Freedom Care submits that plaintiff underestimates the role in which Hill, as Jellico's supervising nurse, plays in ensuring that Freedom Care is compliant and that Freedom Care's EEOICPA patients receive proper care. The fact that the Tennessee Department of Health, after being informed of Freedom Care's arrangement, has done nothing to investigate or prohibit Freedom Care's conduct, Freedom Care argues, also shows that its arrangement with Jellico is lawful.

Under Tennessee law, no person may provide home health services except after applying for and receiving a certificate of need for the same. Tenn.Code Ann. § 68–111607. Similarly, no person may operate a home care organization without having a license. Tenn.Code Ann. § 68–11–204. The statute defines a "home care organization" as one providing "home health services, home medical equipment services, professional support services or hospice services to patients on an outpatient basis in either their regular or temporary place of residence." Tenn.Code Ann. § 68–11–201(17)(A). "Home health services" is defined as follows:

a service provided an outpatient by an appropriately licensed health care pro-fessional or an appropriately qualified staff member of a licensed home care organization in accordance with orders recorded by·a physician, that includes one (1) or more of the following:

(A) Skilled nursing care, including part-time or intermittent supervision;

(B) Physical, occupational or speech therapy;

(C) Medical social services;

(D) Home health aide services;

. . . .

Tenn.Code Ann. § 68–11–201(20). In implementing and carrying out these statutes, the Tennessee Department of Health has issued a set of regulations entitled "Standards for Homecare Organizations Providing Home Health Services," Tenn. Comp. R. & Regs. Rule 1200–8–26.01, *et seq.* (2007) (the "Rules"). The Rules note that licenses are issued to the person listed on the application and in accordance with the geographic area specified by the certificate of need, and that licenses are not transferable or assignable. Rule 1200–8–26.92(1), Tenn. Comp. R. & Regs. The same is true of the certificate of need itself. Tenn.Code Ann. § 68–11–1620 ("[T]he transfer of a certificate of need shall render the certificate of need and all rights under it null and void.").

Under the Rules, the agency to whom the license is issued is responsible for all "[a]dministrative and supervisory functions," Rule 1200–8–26.04(5), Tenn. Comp. R. & Regs., and any home health services "not provided directly by the licensed agency shall be monitored and controlled by that agency." *Id.* Among its other duties, the agency must determine if the patient's needs can be met by the organization's services and capabilities and must also obtain the a consent form from the patient for home health services. Rule 1200–8–26.05(3), (5), Tenn. Comp. R. & Regs. In regards to the question of wheth-

er an agency can delegate to others the provision of care, the Rules state as follows:

> [a]n agency shall provide at least one of the qualifying home health services directly through agency employees, but may arrange with another licensed organization or health care professional to provide any additional home health services. Home health services provided under arrangements with another licensed home care organization or professional organization shall be subject to a written contract conforming with the requirements of this chapter.

Rule 1200–8–26.06(1), Tenn. Comp. R. & Regs.

Based upon this regulatory backdrop, in *Scott v. Ashland Healthcare Center, Inc.*, 49 S.W.3d 281 (Tenn.2001), the Tennessee Supreme Court examined · an agreement between two health care providers in the nursing home industry in which one provider, who was issued a certificate of need and license to construct and operate a nursing home facility, leased the facility to the second provider, who would in turn operate the facility. The issue of whether this arrangement was proper arose in the context of a tort action against the nursing facility for the death of a resident, in which the plaintiff asserted that the owner of the facility and certificate of need holder had a non-delegable duty to initiate operation of the facility. *Id.* at 285. In light of the statutory scheme requiring the operating agency to obtain both a certificate of need and license, and the lack of transferability of those documents, the Court held the "the legislature intended the certificate of need holder's duty to operate the health care facility to be non-delegable." *Id.* at 287.

Although *Scott* concerned the operation of a health care facility, rather than the provision of in-home health services, the principles espoused in *Scott*, in conjunction with the applicable statutory provisions and Rules as previously discussed, lead the Court to conclude that Freedom Care's agreement with Jellico is prohibited under the current regulatory scheme. It is undisputed that Freedom Care is a home care organization providing home health services as defined by Tennessee law. As Deyampert Garner, president of Freedom Care, testified during depositions, Jellico provides no actual care to the patients covered under the EEOICPA program [Doc. 31–4 at 170:6–17]. The only interaction between Jellico and the patients occurs when Ms. Hill accompanies Freedom Care staff approximately every two weeks [*Id.* at 167]. Ms. Hill travels to the office and then accompanies one of the staff on a home visit [*Id.*]. During these visits, however, it does not appear that Ms. Hill provides any care, but merely supervises the Freedom Care staff member's administration of care. To this extent, Mr. Garner characterized Ms. Hill's visits as "just like having a little bird on your shoulder to make sure you are doing right" [*Id.*]. Similarly, Pam Hamman, the office administrator for Jellico's home care department, testified that during these supervisory visits Ms. Hill makes observations as to the condition of the patient but that her role is not to assess the care provided by Freedom Care's employees [Doc. 31–6 at 30:5–10]. Ms. Hamman also testified that the supervisory visits last approximately 30 minutes [*Id.* at 167:14–16]. Ms. Hill's time is not billed to the Department of Labor; only the Freedom Care staff member's time is billed for reimbursement [Doc. 31–4 at 167:9–21]. Aside from visiting patients, Garner testified that Ms. Hill would sit down and discuss with office employees any problems that may have arisen in the past two weeks [*Id.* at 168].

Based on the evidence submitted by the parties, the Court finds that Ms. Hill's

responsibilities do not constitute a qualifying home health service, and necessarily concludes that Jellico does not directly provide any qualifying home health services, so that Freedom Care cannot rely upon Rule 1200–8–26–.06 as permitting its arrangement with Jellico. The only definition of "home health service" Freedom Care could assert that Ms. Hill's services fall under is skilled nursing care including part-time or intermittent supervision. Tenn.Code Ann. § 68–11–201(20)(A). Although neither the Rules nor statute provide a definition for "skilled nursing care," Ms. Hill does not appear to administer any care to the patients she visits with Freedom Care staff nor assess the care provided [Doc. 31–6 at 30:5–10]. The evidence indicates that her role is to merely observe and then to take note of any issues.[4] Even if Ms. Hill's activity constituted "intermittent supervision" under the statutory definition, the Court notes that her supervision is not conducted pursuant to a doctor's orders and her time is not billed to the Department of Labor, unlike the Freedom Care employees who provide the actual care. The Court thus finds that Jellico provides no qualifying home health care service and may not delegate other responsibilities to Freedom Care. Freedom Care cannot rely upon Rule 1200–8–26–.06 because Freedom Care is not "another licensed organization" under the regulation, and there has been no evidence that Jellico enters into an arrangement with the actual nurses who provide care so that they could be said to have an arrangement with a "health care professional," as it is Freedom Care who hires and trains its own nurses.

The Court's conclusion in this regard is bolstered by examining other aspects of the relationship between Jellico and Freedom Care. Freedom Care receives referrals for potential patients, meets with the patients, arranges for them to meet with their doctors, and then initiates contact with the Department of Labor in order to get the patient's care authorized. Freedom Care is responsible for evaluating whether the patients' needs can be met, and for obtaining the patient's consent. As Mr. Garner testified, Jellico's role in this process is "[n]othing" [Doc. 31–4 at 218:23], other than being generally kept informed by Freedom Care. Once a patient has been obtained, Freedom Care, rather than Jellico, obtains nurses to provide in-home care [*Id.* at 220:7–11]. There is no evidence that Jellico's role, aside from the supervision previously discussed, extends beyond remitting payment to Freedom Care once it receives reimbursement for the Department of Labor, keeping a small portion of the reimbursement for itself. Through this relationship, then, Jellico has improperly delegated administrative and supervisory duties to Freedom Care without the type of "monitor and control" contemplated by the Rules.

The Court finds Freedom Care's other arguments insufficient to create a general issue of material fact as to whether Freedom Care's home care organization is operating without the proper licensure. While Freedom Care argues that the Tennessee Department of Health has started no investigation or taken any other action to prohibit Freedom Care's operation, despite knowing of Freedom Care and Jellico's agreement, Freedom Care cites to no authority for the idea that an agency's lack of investigation precludes the Court from finding that an entity is acting unlawfully. Similarly, the Court does not find that Freedom Care's argument about the quali-

---

**4.** Ms. Hamman testified that she was unaware if Ms. Hill reviewed the patient's file while visiting patients [Doc. 31–6 at 30:20].

ty of care it provides create a genuine issue of material fact as to the question of whether its operation is impermissible. Accordingly, the Court concludes that plaintiffs have shown that Freedom Care's relationship with Jellico is prohibited by the regulatory scheme, so that Freedom Care cannot rely upon Jellico's Certificate of Need and home care license. Plaintiffs are thus entitled to summary judgment on this issue as it relates to plaintiffs' claims for recovery.

## B. Tortious Interference with Business Relationships

Turning now to the parties' arguments as they relate to plaintiffs' claims, Freedom Care first argues in support of its motion that summary judgment is proper as to plaintiffs' claim for tortious interference with business relationships,[5] as plaintiffs cannot show evidence as to several of the elements necessary to establish a claim under Tennessee law. Specifically, Freedom Care argues that plaintiffs cannot establish that they had a business relationship with Patient A or Patient B, that plaintiffs cannot show that Freedom Care employed an improper means or had an improper motive in receiving Patients A and B as patients, and that plaintiffs cannot show they suffered any damages. In response, plaintiffs argue that there are questions of fact as to the nature and circumstances under which Patients A and B began receiving care, and the mere fact that Freedom Care is serving or has served Patients A and B is sufficient to demonstrate damages in order to avoid summary judgment. Plaintiffs also argue that Freedom Care damaged prospective business relationships with potential EEOICPA patients, while Freedom Care argues in reply that there is no evidence of any harm to prospective business relationships.

■ Under Tennessee law, the tort of intentional interference with business relationships requires a plaintiff to demonstrate the following:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third parties, (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general, (3) the defendant's intent to cause the breach or termination of the business relationship, (4) the defendant's improper motive or improper means, and (5) damages resulting from the tortious interference.

*Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn.2002) (emphasis and internal citation omitted). The Trau–Med court noted that whether a party "acted 'improperly' or possessed an 'improper' motive is dependent on the particular facts and circumstances of a given case...." *Id.* at 701, n. 5. The Trau–Med court, however, also required a showing that the defendant's "predominant purpose was to injure the plaintiff." *Id.* As to the alternative method of showing improper means, the Trau–Med court listed numerous examples of improper interference, including "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," *id.* as well "methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct...." *Id.* A plaintiff attempting to establish this evidence need only show either improper means or improper motive. *L–S Indus., Inc. v. Matlack*, 641 F.Supp.2d 680, 683–84 (E.D.Tenn.2009) ("The fourth factor requires either improper motive or means, not both.").

As to Freedom Care's argument that PCM cannot show that it had a business

---

**5.** The parties also refer to this claim as "inter- ference with economic advantage."

relationship with patients A or B, under the first element necessary for an interference claim, Freedom Care asserts that PCM is not the proper party to raise this claim, as the agreements at issue were between the patients and PCMT. As PCMT has since been added as a party to this case [Doc. 80], however, the Court finds this argument moot.

Regarding Freedom Care's argument as to improper means, Freedom Care submits that there is no evidence that it was engaged in any improper conduct other than helping out Patient A's family in their time of need, as Patient A was no longer under plaintiffs' care at the time Ms. Williams called Freedom Care. With respect to Patient B, Freedom Care argues that Patient B initiated contact with Freedom Care after learning about the company from a third party, so that there is no evidence showing how Freedom Care improperly interfered with plaintiffs' relationship with Patient B. Freedom Care also argues that there has been no evidence that Freedom Care's primary purpose in obtaining Patient A or Patient B was to injure PCMT so as to support a showing of improper motive. In addition, that Freedom Care should be entitled to a competitor's privilege which negates a finding of improper motive, citing to *Watson's Carpet & Floor Covering, Inc. v. McCormick,* 247 S.W.3d 169 (Tenn.Ct.App.2007).

■ Based on the evidence submitted by the parties, the Court finds that there is a question of fact as to whether Freedom Care improperly interfered with the business relationship between plaintiffs and Patient A. Although plaintiffs discharged Patient A while he was in the hospital, plaintiffs submitted evidence that the purpose of this discharge was to make nursing home care available following his release from the hospital, until such time

that plaintiffs received authorization from the Department of Labor [Doc. 41–1 at 23:15–19; 26:17–21]. Plaintiffs had provided care to Patient A without reimbursement or payment from his family for eighteen months as it sought to obtain authorization from the Department of Labor, which, evidence shows, included a trip to the national office in Washington, D.C. [*Id.*]. Although plaintiffs discharged Patient A, evidence shows that plaintiffs planned on providing services again once they received authorization [Doc. 41–1 at 107:22–23]. Plaintiffs still had the patient file and other information in Patient A's home subsequent to his discharge [*Id.* at 108:8–9]. This evidence indicates that, although plaintiffs may not have been in a formal contractual relationship at the time, there was still a business relationship between the two parties, or alternatively, a prospective business relationship pending authorization. *See Trau–Med,* 71 S.W.3d at 701, n. 4 (quotation omitted) (noting that "interference with a continuing business or other customary relationship not amounting to a formal contract" is also covered under the tort).

■ The Court also finds there is sufficient evidence of Freedom Care's improper means as to Patient A. Although Freedom Care points out that Ms. Williams contacted Freedom Care, the Court notes that Freedom Care was in violation of Tennessee statute and regulations by operating without a license or Certificate of Need, as previously discussed, which qualifies as an "improper means" under *Trau–Med.* There is also evidence that Ms. Williams specifically learned about Freedom Care through its advertisements of the services it provided, even though Freedom Care could not lawfully provide those services [Doc. 41–2 at 3 ¶ 10; Doc. 57 at 2 ¶ 7].[6] In addition, the

---

**6.** There was also evidence that Amanda Stin-

nett, who originally worked for PCM before

Court finds support for plaintiff's position based on the fact that Freedom Care recruited six nurses who were providing care to Patient A to continue to provide that care as Freedom Care employees [Doc. 56 at 2–3 ¶¶ 13–14; Doc. 57 at 2 ¶ 8]. Plaintiffs presented evidence showing that Ms. Stinnett led this recruitment effort, and in doing so, not only violated her own restrictive covenant but also asked other PCM employees to potentially breach their restrictive covenants by working for two home health providers at the same time [Doc. 56 at 2–3 ¶¶ 13–14].[7]

 Finally, while Freedom Care argues that plaintiffs have not calculated damages as to Patient A, plaintiffs have shown that there is a genuine issue of material fact as to Freedom Care's improper interference, meaning that there is also a question of fact as to whether this interference damaged plaintiffs by depriving them of reimbursement from the Department of Labor for Patient A's care. Evidence in the record indicates that Jellico receives approximately $65 an hour from the Department of Labor, approximately $53 of which goes to Freedom Care [Doc. 31–4 at 221:14–21]. Although the availability of damages depends upon the conclusions reached by the trier of fact, the existence of damages upon a finding of liability is therefore neither speculative nor uncertain. Plaintiffs have no obligation to submit a precise amount of damages in order to defeat a motion for summary judgment. *See Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*, 707

S.W.2d 1, 15 (Tenn.Ct.App.1985) (citing *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn.Ct.App.1983)) (noting that "uncertain and speculative damages are prohibited only when the existence of damages is uncertain not when the amount of the damage is uncertain").

 The Court concludes, however, that there is insufficient evidence to create a genuine issue of material fact as to Freedom Care's liability with respect to Patient B. Unlike Patient A, there is no evidence of Patient B being led to Freedom Care by advertisements about its services or of any other "interference" on the part of Freedom Care. Although plaintiffs call into question the sincerity of Patient B's affidavit, they cite to no contrary evidence in the record. In addition, plaintiffs argue that Patient B left for Freedom Care around the same time that as one of plaintiffs' employees found a Freedom Care brochure in a patient's home, but, as Freedom Care points out, there is no evidence to suggest any such brochures were left in Patient B's house. Although the Court is required to draw inferences in the non-moving party's favor, concluding that Patient B was improperly solicited would be based on speculation rather than on the evidence in the record. Similarly, the Court finds there is no genuine issue of material fact as to any other identifiable class of third persons to support a finding that Freedom Care interfered with a prospective relationship. Although PCMT has identified a class of third persons, that

---

also working for Freedom Care, left Freedom Care brochures in a patient's home [Doc. 57 at 2 ¶ 13].

7. The Court however, does not find sufficient evidence that Freedom Care's "primary purpose" was to injure PCMT rather than to build its own business so as to find a question of material fact as to whether Freedom Care had an improper motive, particularly in light

of the fact that Freedom Care was a competitor. *See Watsons's Carpet*, 247 S.W.3d 169, 184 (Tenn.Ct.App.2007) (holding that, based on previous state precedent, the "Tennessee Supreme Court, faced with the direct question, would hold that a competitor enjoys a privilege as to the improper motive requirement of the fourth element of the tort of intentional interference with business relationships").

is, future EEOICPA patients, PCMT has not offered any evidence of interference or any proof of damages, precluding recovery. *See PPG Indus. v. Lee Payne*, 2012 WL 1836314, at *4, 2012 U.S. Dist. LEXIS 70359, at *12 (E.D.Tenn. May 21, 2012) (Jordan, J.). Accordingly, the Court finds a genuine issue of material fact as to plaintiffs' tortious interference claim, but only as it relates to Patient A.

## B. Tortious Inducement to Breach Agreements

Freedom Care also seeks summary judgment on plaintiffs' claim for tortious inducement to breach plaintiffs' nurses' employment agreements, based on plaintiffs' claim that Freedom Care recruited nurses away from PCM, causing them to breach their restrictive covenants. In support of its position, Freedom Care argues that PCM's agreements are void under Colorado law prohibiting restrictive covenants, and that none of the exceptions provided for by statute are applicable in this case. Freedom Care also argues that PCM cannot show damages with respect to this claim. Plaintiffs argue that the statutory exception for trade secrets applies to the restrictive covenants, and submit that whether something qualifies as a trade secret is a question of fact. Plaintiffs also argue that there is a question of fact as to whether nurses qualify as professional staff so as to be exempt from the ban on restrictive covenants, and similarly a question fact as to damages.

▮▮▮▮▮ Colorado Revised Statute § 8–2–113(2)[8] generally prohibits "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer," although the stat-

ute lists several exceptions, including "[a]ny contract for the protection of trade secrets." What constitutes a trade secret is a question of fact. *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1341–42 (Colo. App.1984). In considering whether business information could be a trade secret, the *Porter* court set forth a number of factors to be evaluated, including:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.*, by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id.* at 1341. Generally, "the most commonly accepted definition of trade secrets is restricted to confidential information which is not disclosed in the normal process of exploitation." *Id.* (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 266, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979)). For a covenant not to compete to fit within the trade secret exception, "the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets." *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo.App.1997).[9]

▮▮▮ Based on consideration of the *Porter* factors, and in light of the definition set forth by the Supreme Court in *Aron-*

---

**8.** The parties agree that Colorado law governs the analysis of the restrictive covenants at issue in this case, as indicated in the covenants [Doc. 51–2].

**9.** The Court notes that there is no dispute as to the validity of the purpose or scope of the covenant.

*son,* the Court finds there is a question of fact as to whether the identification of PCM patients and their corresponding medical information could constitute trade secrets under the statute. As to the first factor, a patient's information is not well-known outside of the business, and, as Freedom Care admits, is generally considered to be confidential information, as it would only be accessible to certain members of a patient's family, the patient's doctors, and, the patient himself. While Freedom Care may argue that the confidential nature of the information is driven by independent legal requirements, rather than PCM's proprietary interests, "the two are not mutually exclusive." *Poller v. BioScrip, Inc.,* 974 F.Supp.2d 204, 217 (S.D.N.Y.2013) (finding genuine issue of material fact as to whether "compilations of its referral sources [generally, doctors or nurses], together with corresponding patient names, treatments, dosages, insurance information, hospitals, and territory area are protectable as trade secrets"). The fact that the law may require a patient's information to be confidential does not preclude a finding that the information is also valuable as a business asset and merits protection. Notably, the evidence presented shows that home care providers such as plaintiffs and Freedom Care exert a large amount of time, money, and effort in learning whether a patient may be eligible for EEOICPA care, getting these potential patients to doctors to obtain a treatment plan, and then obtaining authorization to provide care for which they are reimbursed by the Department of Labor [*See* Doc. 31–4 at 218–221 (describing the process by which a patient enters the EEOICPA program) ]. Evidence was submitted of plaintiffs providing care to Patient A for eighteen months while it waited to receive authorization without reimbursement. This shows that the information sought to be protected by the restrictive covenant is not just medical information, but, similar to a customer list, also includes patient identities, the level of care being provided, and consists of the goodwill developed between plaintiffs and their patients during the provision of care. Were PCM's nurses able to provide this information to Freedom Care, or another competitor, the other competitor would be able to save the time and expense of learning about the patient's condition, learning of their eligibility, and enrolling them in the EEOICPA program, without the risk of waiting for authorization. It would also enable competitors to save costs on hiring and training nurses and developing a plan of care, because the nurse providing care would already be trained to attend to the patient's needs. There is evidence in the record of this happening when Patient A's nurses started providing care to him as Freedom Care employees, as Sandra Davis, one of the nurses hired by Freedom Care, claims that she underwent no interview and received no formal training or orientation prior to providing care to Patient A [Doc. 57 at 2 ¶ 10]. From this, the Court concludes there is a genuine issue of material fact as to whether the patient information covered by the restrictive covenant constitutes a trade secret under Colorado law.[10]

With respect to defendant's argument that plaintiffs cannot show any damages

10. Plaintiffs also argue that the nurses themselves are exempt as "professional staff" under Colo.Rev.Stat. § 8–2–113(2)(d), which excludes "[e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel." The Court, however, finds that there is no evidence or any argument from plaintiffs that the nurses, assuming they are professional staff, are professional staff "to executive and management personnel" as required by the plain language of the statute.

as to the inducement claim, the Court disagrees. As previously discussed, there is evidence in the record that Freedom Care, using Stinnett's inside knowledge of who was providing care to Patient A, recruited Patient A's nurses to better position itself to provide adequate care to Patient A once he became a client. Were a jury to agree with plaintiffs' position, then a jury could also conclude that Freedom Care deprived plaintiffs of the reimbursement for Patient A's care it would have received had it been in a position to provide care to Patient A, or any other patients whose nurses violated their restrictive covenants and began working for Freedom Care. While Freedom Care points to the fact that plaintiffs have not sued the individual employees who are alleged to have breached their restrictive covenants in support of their argument, Freedom Care cites to no case law indicating that this would preclude plaintiffs from recovering, were a factfinder to conclude that Freedom Care induced the nurses to breach their agreements. Accordingly, Freedom Care's motion as to this claim will be denied.

### D. Violation of the TCPA

Based on Freedom Care's unlawful operation, plaintiffs argue that by continuing to operate and advertise its services without the proper licensing, Freedom Care is engaging in a deceptive act resulting in an ascertainable loss to plaintiffs, so that summary judgment in plaintiffs' favor is proper as to their TCPA claim. In support of its motion for summary judgment, Freedom Care argues that PCM cannot show that it has suffered any damages.

■■■ In order to recover under the TCPA, a plaintiff must prove "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated'." *Cloud Nine, LLC v. Whaley*, 650 F.Supp.2d 789, 797–98 (E.D.Tenn.2009) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn.Ct.App.2005)). The Tennessee Supreme Court has recognized that a deceptive act or practice includes a material representation, practice or omission likely to mislead a reasonable consumer. *Id.* at 796 (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn.1997)). "[P]laintiffs asserting claims under the TCPA are required to show that the defendant's wrongful conduct proximately caused their injury." *Id.* at 798 (quotation omitted). Ordinarily, proximate cause is a question for a jury "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Id.* (quotation omitted).

■■■ In this case, Freedom Care does not dispute that its practices of operating without a license and advertising of its services without the necessary licensing to provide them constitute a deceptive act for purposes of the TCPA. Additionally, with respect to the element of damages and proximate cause, the Court concludes that issue similarly should be left for determination by the finder of fact. As previously discussed, the Court finds that there is a question of fact as to whether Patient A's family learned about Freedom Care through its advertisements and solicitations, and whether this influenced their decision to obtain care through Freedom Care, rather than plaintiffs. Similarly, there is a question of fact as to whether Freedom Care recruited PCM's nurses so as to provide Patient A with the same level of care. This evidence, however, must be taken in conjunction with the fact that it was Patient A's family who initiated contact with Freedom Care, after plaintiffs

had discharged the patient. Given the competing views of the facts presented by the parties, the Court concludes that granting summary judgment as to either party would be inappropriate at this stage of the proceedings. Accordingly, both parties' motions for summary judgment as to plaintiffs' TCPA claim will be denied.

### E. Unfair Competition

Both parties also move for summary judgment as to plaintiffs' claim for the common law tort of unfair competition. Freedom Care asserts that plaintiffs have not established a tort from which to recover, and have not shown any damages, while plaintiffs assert that Freedom Care is competing unfairly because it is operating unlawfully.

██ Although, as courts have noted, Tennessee law regarding unfair competition is "not well-developed," *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir.1996), it appears that there are three elements to this tort. A plaintiff must prove that: (1) the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization. *Brainard v. Vassar*, 561 F.Supp.2d 922, 937 (M.D.Tenn.2008) (quoting *Sovereign Order*, 119 F.3d at 1243).

In this case, plaintiffs have not argued or presented any evidence as to whether Freedom Care passed off itself as plaintiffs' companies or that, in providing care to former plaintiffs' patients, it did so acting as if the services came from plaintiffs themselves. Nor has PCM presented any evidence that the public was confused as to

the source of the care provided to its patients. While the parties cite to Tennessee Courts of Appeals cases extending the tort of unfair competition to claims outside of the context of trademark, *see B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 478–79 (Tenn.Ct.App.1995) (extending tort to fiduciary duty claim), neither party cites to Tennessee case law extending the tort of unfair competition to factual situations analogous to this case. Accordingly, Freedom Care is entitled to summary judgment as to plaintiffs' claim of unfair competition.

### F. Violation of Tenn.Code Ann. § 68–11–229

As to plaintiffs' claim that Freedom Care has violated Tenn.Code Ann. § 68–11229, Freedom Care submits that it would be willing to consent to a permanent injunction pending the favorable resolution of plaintiffs' other claims. Freedom Care does not admit that violations occurred or otherwise address the merits of this claim. Plaintiffs submit that there are genuine issues of material fact precluding summary judgment. As Freedom Care is not entitled to summary judgment with respect to plaintiffs' other claims, plaintiffs' claim in this regard will proceed to trial along with the others.

### G. Injunctive Relief

Finally, in their motion for partial summary judgment plaintiffs argue that since there is no genuine issue of material fact as to whether Freedom Care is operating unlawfully, plaintiffs are entitled to a permanent injunction restraining Freedom Care from providing home health care until it obtains a certificate of need and home care license. The claim for injunctive relief is based on plaintiffs' TCPA and unfair competition claims. Freedom Care argues

that injunctive relief should not be used simply to shut down a competitor.

 The standard for a permanent injunction is "essentially the same as for a preliminary injunction with the exception that the plaintiffs must show actual, as opposed to a likelihood of, success on the merits." *A.C.L.U. of TN v. Rutherford Cnty.*, No. 3:02 0396, 2006 WL 2645198, at *4 (M.D.Tenn. Sept. 14, 2006) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)); *see, e.g. Cummings v. Husted*, 795 F.Supp.2d 677, 686 (S.D.Ohio 2011). Thus, the Court must consider four factors in determining whether to grant a permanent injunction: (1) the plaintiff's success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest. *A.C.L.U.*, 2006 WL 2645198 at *4. "An evidentiary hearing typically is required before an injunction may be granted, but a hearing is not necessary where no triable issues of fact are involved." *United States v. Miami University*, 294 F.3d 797, 816 (6th Cir. 2002)

In this case, the Court concludes that the issuance of a permanent injunction is inappropriate at this time. As to the first factor, although plaintiffs have shown that Freedom Care is operating unlawfully without the necessary Certificate of Need and home care license, plaintiff has not succeeded on the merits of either its TCPA claim or unfair competition claim for all the reasons previously discussed. There are genuine questions of fact as to whether Freedom Care caused plaintiffs an ascertainable loss as required by the TPCA and Freedom Care is entitled to summary judgment on plaintiffs' unfair competition. Plaintiffs may prove that Freedom Care caused an ascertainable

loss at trial, which would entitle it to injunctive relief under the statute; the Court merely concludes that, at this stage of the proceedings, it cannot grant injunctive relief prior to plaintiffs showing success on the merits. In addition, although the Court recognizes its discretion to deny injunctive relief based on plaintiffs' failure to satisfy this first factor, *see Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997), a cursory review of the other factors similarly indicate that a permanent injunction is inappropriate at this time. With respect to the second factor, plaintiffs have claimed they will suffer irreparable harm absent a permanent injunction but have not presented evidence as to what type of harm they will suffer, nor shown that damages would be inadequate for any of the harm caused by Freedom Care. The Court finds this to be particularly true given that factual questions remain as to the nature and extent of plaintiffs' damages for the reasons previously discussed. Turning to the third factor, were a permanent injunction to issue, and Freedom Care was prohibited from providing care to EEOICPA patients, the Court notes that the possibility substantial harm not only to Freedom Care and Jellico, but also to the EEOICPA patients currently receiving in-home treatment by Freedom Care. In light of the consideration of these factors, the Court concludes that plaintiffs have not shown that injunctive relief is warranted for the purposes of summary judgment.

## IV. Conclusion

Accordingly, plaintiffs' Motion for Partial Summary Judgment [Doc. 31] and Freedom Care's Motion for Summary Judgment [Doc. 34] are **GRANTED in part** and **DENIED in part** for the reasons stated and to the extent previously discussed. It is hereby **ORDERED** that plaintiffs are entitled to summary judg-

ment on the issue of Freedom Care's operating a home care service without the necessary licensing, and Freedom Care is entitled to summary judgment on plaintiffs' claim for unfair competition. This matter will proceed to trial on plaintiffs' remaining claims.

IT IS SO ORDERED.