IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 1, 2016 Session


## JANA HILL v. MICHAEL GANNON, ET AL.

**Appeal from the Circuit Court for Putnam County**
**No. 12N0303     Jonathan L. Young, Judge**

_____

**No. M2015-00528-COA-R3-CV – Filed April 18, 2016**
_____


This is a wrongful termination case. Appellant appeals the trial court's grant of summary judgment on her claims of intentional interference with at-will employment and civil conspiracy on the part of Appellees. Because Appellant has not averred facts sufficient to make out a claim for intentional interference with at-will employment, we affirm the trial court's grant of summary judgment on that claim. In the absence of an underlying tort, we also affirm the trial court's dismissal of Appellant's claim for civil conspiracy. Affirmed and remanded.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**


KENNY ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

William Gary Blackburn and Bryant Beatty Kroll, Nashville, Tennessee, for the appellant, Jana Hill.

Nathan D. Rowell, Brian Robert Bibb, Knoxville, Tennessee, and Daniel H. Rader, III, and Daniel H. Rader, IV, Cookeville, Tennessee for the appellees, Michael Gannon, and Luke Collins.

## OPINION

### I. Background

Appellant Jana Hill was employed as an "Executive Assistant" for the Upper Cumberland Human Resource Agency ("UCHRA"). Ms. Hill's base salary was $53,736.00 per year plus benefits. With benefits, Ms. Hill's total salary was approximately $70,000.00. Michael Gannon is the County Executive for Cannon County, and, by virtue of his office, serves on the boards of the Upper Cumberland Development District and the UCHRA. At the time Ms. Hill's employment was terminated, Luke Collins (together with Mr. Gannon, "Appellees") was the executive director of the UCHRA. Prior to Mr. Collins' appointment, Ruth Ann Woolbright served as the interim executive director. According to the complaint, the Board had no authority concerning personnel matters at the UCHRA; rather, the executive director was in charge of those aspects of the agency. According to the complaint, Mr. Gannon had a personal relationship with Ms. Beth Stephens, who worked under Ms. Hill's direct supervision. On August 4, 2011, UCHRA program directors recommended that Ms. Stephens be fired. Five days after this recommendation, Ms. Woolbright received a call from Mr. Gannon. Ms. Woolbright brought Ms. Hill into the conversation, and Mr. Gannon allegedly told Ms. Hill that "there will be repercussions for you by the Board." After Ms. Woolbright turned down permanent status as executive director, Ms. Hill avers that Mr. Gannon "reached an understanding with Luke Collins that required Mr. Collins to terminate . . . Hill as a condition of his employment as Executive Director." Ms. Hill also alleges that Mr. Gannon "reached an understanding with Mr. Collins to favor his friend Beth Stephens regardless of the needs or welfare of the Agency or its clients." Mr. Collins ultimately named Beth Stephens as his Executive Assistant. On June 26, 2012, Ms. Hill was informed that her job was being "eliminated"; however, the same email, *infra*, indicated that another position was being created. This new position was to be called "Administrative Assistant" with annual pay of approximately $29,000.00. Ms. Hill did not apply for the "Administrative Assistant" position, but alleges that this was just another name for the job that she held. On July 13, 2012, Ms. Hill's employment was terminated.

On November 7, 2012, Ms. Hill filed suit against the Appellees in the Circuit Court for Putnam County.[1] By her complaint, Ms. Hill alleged: (1) statutory retaliatory discharge pursuant to the Tennessee Public Protection Act, T.C.A. §50-1-304; (2) common law retaliatory discharge; (3) statutory retaliatory discharge pursuant to the Tennessee Whistleblower Protection Act, T.C.A. §8-50-116; (4) tortious interference with at-will employment; and (5) civil conspiracy. Subsequently, Ms. Hill dismissed all of her claims

---

[1] Ms. Hill also named UCHRA as a defendant in her lawsuit; however, by agreed order of February 24, 2014, UCHRA was voluntarily dismissed from the lawsuit.

except for the tortious interference with at-will employment by Mr. Gannon, and her claim for civil conspiracy against Messrs. Gannon and Collins. Concerning these causes of action, Ms. Hill's complaint states:

> 38. Plaintiff Jana Hill was an at-will employee of the UCHRA. The Defendant Gannon intentionally and without justification secured the discharge of the plaintiff. At the time of this conduct, Mr. Gannon lacked authority to terminate and the adverse job action was not made in pursuit of any legitimate function as a member of the Board of the Agency, but was made for personal reasons, vindictiveness, and in order to engage in favoritism contrary to his duties as a member of the Board.
>
> ***
>
> 39. Defendants Gannon and Collins agreed and conspired to terminate the plaintiff from her employment, for unlawful reasons and for unlawful or unjustifiable purposes. They are therefore jointly and severally liable for civil conspiracy.

In their answer, filed on December 17, 2012, Appellees denied any liability, arguing that Ms. Hill's employment was terminated "for economic reasons and that this action was proper." In their answer, Appellees admitted that: (1) the executive director is charged with the responsibility of the management of the agency staff. The executive director is called on to hire, terminate, and promote agency staff without interference from the members of the Board; (2) "Mike Gannon, as a member of the Board does not have authority over specific personnel matters in the agency. It is further admitted that individual board members have no authority over specific personnel matters;" and (3) Mr. Gannon "did not have the authority to terminate [Ms. Hill's employment]." The answer goes on to state that, "[w]hile it is agreed that Mr. Gannon did not have the authority to terminate [Ms. Hill's employment,] it is likewise agreed that he thought her job was unnecessary and that she was being paid a clearly excessive amount of money to provide the services that she was called on to provide." Appellees further denied that Messrs. Gannon and Collins "agreed and conspired to terminate [Ms. Hill] from her employment."

On December 16, 2013, Appellees filed a motion for summary judgment. In support of their motion, Appellees filed depositions from Mr. Collins, Ms. Hill, and Ms. Woolbright. Ms. Hill opposed the motion for summary judgment. Following a hearing on February 20, 2015, the trial court entered an order, on March 9, 2015, granting summary judgment in favor of Appellees. The March 9, 2015 order provides, in relevant part, that:

This Court . . . finds that the undisputed facts do not identify conduct of Mr. Gannon that raises [sic] to the level that would bring it outside his legitimate function as Board Member. The Court finds it reasonable and appropriate that a Board Member should have communication with the Executive Director, including such issues as an employee. The Court finds that [Ms. Hill's] allegations and the undisputed facts are insufficient to show the third-party relationship necessary to prevail on a claim of tortious interference [with] at-will employment. The Court finds that even if it were found that Mr. Gannon acted with a degree of spite, the Court finds that Defendant Gannon's legitimate purposes are not overcome by such spite, and that [Ms. Hill] cannot sustain a claim for tortious interference with an at-will employment relationship as a matter of law.

The Court further additionally finds that the [Appellees] have articulated a legitimate, nondiscriminatory reason with respect to the termination of Ms. Hill, that she was simply overpaid. The Court finds this to be a legitimate business decision, consistent with Tennessee's status as an at-will employment state.

The Court further finds that [Ms. Hill's] claim of civil conspiracy fails, in the absence of an underlying tort, since the tortious interference claim has failed as well. The Court additionally finds that both Collins and Gannon were members of the corporation and that the corporation and board members cannot conspire amongst themselves and summary judgment is appropriate for this reason, as well.

In its comments from the bench, which were incorporated, by reference, into its March 9, 2015 order, the trial court explained:

[T]he facts do show that there was some spite on the part of Mr. Gannon. However, I think, as a board member, he was acting within his employment to talk to the candidates or the actual executive director as to his issues with the plaintiff in this matter. I think it is clear that the—that there is spite going on. However, I don't think that that raises the level to get it outside of his legitimate function as a board member.

I think that the executive director or the candidates can hear all sides. I think a board member is dually tasked to act in the best interest of the corporation. I feel that he may have had some personal motivation behind that. However, I think the executive director would like to know from his board members. I think it is clear that—from the record, that everybody says that Ms. Hill was a good employee. I think there is the argument out there that she could have gotten another less-paying job if she had wanted to do so. So I

think there is that on the record.[2]

It was . . . argued . . . that there was a vindictive motive by Mr. Gannon in getting rid of Ms. Hill.  However, I don't think that rises to the authority.  There is also a legitimate reason to get rid of Ms. Hill, stated by Mr. Collins, that she was simply overpaid.  I think that is a business decision that is covered by the at-will employment state.

## II. Issues[3]

Ms. Hill appeals.  She raises the following issues for review as stated in her brief:

1. Whether Michael Gannon is immune from suit for tortious interference with the at-will employment of a person over whom he had no authority as a Board member?

2. Whether there was a material question of fact regarding whether Michael Gannon induced the termination of Jana Hill out of spite, vindictiveness and to benefit a personal friend and therefore was not acting in furtherance of a corporate interest?

The gravamen of both of Ms. Hill's issues is whether the trial court erred in granting summary judgment to Messrs. Gannon and Collins.

## III. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

---

[2] Appellant disputes that she was offered another job with the UCHRA.

[3] In her appellate brief, Ms. Hill also raises a third issue:

> Whether T.C.A. §20-16-101, which the Court employed to decide the Defendant's motion for summary judgment, is an unconstitutional invasion of the separate powers of the judicial branch of government?

At oral argument before this Court, Ms. Hill's attorney conceded that the question of whether Tennessee Code Annotated Section 20-16-101 is constitutional was rendered moot by the Tennessee Supreme Court's opinion in *Rye v. Women's Care Center of Memphis, MPLLC*, S.W.3d (Tenn. Ct. App. 2015).  We consider Ms. Hill's attorney's statements at oral argument to be a waiver of the third issue; accordingly, we will not address the constitutionality question in this opinion.

a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment *de novo*, without a presumption of correctness. **Bain v. Wells**, 936 S.W.2d 618, 622 (Tenn. 1997); *see also* **Abshure v. Methodist Healthcare–Memphis Hosp.**, 325 S.W.3d 98, 103 (Tenn. 2010); **Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.**, 395 S.W.3d 653, 671 (Tenn. 2013); and **Rye v. Women's Care Center of Memphis, MPLLC**, 477 S.W.3d 235 (Tenn. Ct. App. 2015). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. **Id.** at 250 (citing **Estate of Brown**, 402 S.W.3d 193, 198 (Tenn. 2013); **Hughes v. New Life Dev. Corp.**, 387 S.W.3d 453, 471 (Tenn. 2012)).

For actions initiated on or after July 1, 2011, the standard of review for summary judgment is governed by Tennessee Code Annotated Section 20-16-101. The statute provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1)     Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>
> (2)     Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. §20-16-101. However, "a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis." **Rye**, 477 S.W.3d at 254-55. Rule 56.03 requires that the moving party support its motion with "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record. **Id.** If the moving party fails to meet its initial burden of production, the nonmoving party's burden is not triggered, and the court should dismiss the motion for summary judgment. **Town of Crossville Hous. Auth.**, 465 S.W.3d 574, 578-79 (Tenn. Ct. App. 2014) (citing **Martin v. Norfolk S. Ry. Co.**, 271 S.W.3d 76, 83 (Tenn. 2008)). As our Supreme Court recently opined:

> [T]o survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more

- 6 -

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co*., 475 U.S. at 586, 106 S. Ct. 1348.  The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 251 (emphasis in original).  If adequate time for discovery has been provided and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted.  *Id*.  Thus, even where the determinative issue is ordinarily a question of fact for the jury, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion.  *White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998).

## IV. Analysis

An at-will employee may be terminated from his or her employment at any time for good cause, bad cause or no cause.  *See **Clanton v. Cain-Sloan Co.***, 677 S.W.2d 441, 443 (Tenn. 1984).  However, the Tennessee Supreme Court has held that an at-will employee has a property interest in continued employment without unjustified interference by those who stand outside the employment relationship.  ***Ladd v. Roane Hosiery, Inc.***, 556 S.W.2d 758, 760 (Tenn. 1977).  "Where a third party intentionally and unjustifiably interferes with that employment interest by procuring the plaintiff's termination, a cause of action [for tortious interference with employment] will lie against the third party." ***Thompson v. Memphis Light, Gas and Water***, 416 S.W.3d 402 (Tenn. 2011), *perm. app. denied* (Tenn. Oct. 18, 2011) (citing ***Baldwin v. Pirellie [Pirelli] Armstrong Tire Corp.***, 3 S.W.3d 1, 6 (Tenn. Ct. App. 1999)).  In ***Thompson***, this Court set out the essential elements of a claim for intentional interference with employment:

> The essential elements of a claim for intentional interference with employment are "that the defendant intentionally and without justification procured the discharge of the employee in question." ***Ladd v. Roane Hosiery, Inc.***, 556 S.EW.2d 758, 760 (Tenn. 1977).  A claim for intentional interference with employment "contemplate[s] a three-party relationship—the plaintiff as employee, the corporation as employer, and the defendants as procurers or inducers." ***Nelson v. Martin***, 958 S.W.2d 643, 647 (Tenn. 1997).

***Thompson***, 416 S.W.3d at 413.  In ***Thompson***, the plaintiff, William Thompson, had worked for Memphis Light, Gas and Water ("MLGW") since 1965.  *Id.* at 405.  At the time his employment was terminated, Mr. Thompson was the senior vice-president and chief

operating officer ("COO") of MLGW. *Id*. at 406. Mr. Thompson served under the former president of MLGW, Herman Morris. *Id*. At some point during Mr. Morris' presidency, Mr. Thompson expressed his concern that certain contracts, bond issues, and a proposed sale of MLGW were illegal. *Id*. In 2004, the Federal Bureau of Investigation began an investigation of MLGW, including an investigation of the above activities; Mr. Thompson was interviewed by FBI agents in relation to this investigation. *Id*. Mr. Morris subsequently left MLGW, and Mr. Thompson applied for the president position. *Id*. Although Mr. Thompson was interviewed and recommended for the position by the search committee, former Memphis Mayor, Willie Herenton, nominated Joseph Lee, III to serve as MLGW's president. *Id*. Thereafter, Mr. Lee met with Mr. Thompson and suggested to Mr. Thompson that he retire; Mr. Thompson declined. *Id*. In September of 2004, Mr. Lee notified Mr. Thompson that his employment was terminated, allegedly based on the elimination of the senior vice-president and COO position. *Id*. Mr. Thompson filed suit against MLGW and Mr. Lee. Mr. Thompson asserted that Mr. Lee was guilty of tortuously interfering with Mr. Thompson's employment. *Id*. at 407. Mr. Thompson further alleged a conspiracy between Mr. Lee and Mr. Herenton "to take punitive job action against him by tortuously interfering with his job for cooperating with the federal investigation and opposing the sale of MLGW." *Id*. The trial court dismissed Mr. Thompson's claims against Mr. Lee, noting that a complaint must "do more than simply parrot the legal elements of the cause[s] of action." *Id*. at 408 (citing *Lee v. State Volunteer Mut. Ins. Co.*, No. E2002-03127-COA-R3-CV, 2005 WL 123492, at *10 (Tenn. Ct. App. Jan. 21, 2005)). The trial court found that Mr. Thompson's complaint alleged tortious interference "only in conclusory terms" and specifically noted that Mr. Thompson "alleges that Lee acted for an improper personal purpose and contrary to the best interests of MLGW without alleging any facts to support these conclusions. Malice, spite or improper motive is alleged, yet no facts are alleged to support these conclusions." *Id*. For the same reasons, the trial court also dismissed the conspiracy claim. *Id*.

As set out in context above, in reaching its decision to grant summary judgment in favor of Messrs. Gannon and Collins, the trial court relied on the holding in ***Thompson***. Although the trial court conceded that "the facts do show that there was some spite on the part of Mr. Gannon," the court ultimately concluded that the modicum of spite did not rise to a level that would be "outside of [Mr. Gannon's] legitimate function as a board member." Accordingly, the trial court held that Ms. Hill's "allegations and the undisputed facts are insufficient to show the third-party relationship necessary to prevail on a claim of tortious interference [with] at-will employment." As discussed by this Court in ***Thompson***:

> A corporation may only act through its agents and employees; consequently, a corporate director, officer or employee is not individually liable for tortious interference with a corporate contract, such as an at-will employment agreement, so long as he is acting in furtherance of the corporate interest. ***Forrester v. Stockstill***, 869 S.W.2d 328, 334-335 (Tenn. 1994). A

- 8 -

corporate director, officer or employee may be held liable for interference with such a contract if "he is acting outside the scope of his authority, acting with malice, or acting to serve his own interests." *Id*. at 333 (quoting Thomas G. Fisher, Annotation, Liability of Corporate Direct [Director], Officer or Employee for Tortious Interference with Corporation's Contract with Another, 72 A.L.R.4th 492 (1989)).

However, where there is intentional interference with an employment contract, there is frequently "some element of ill will"; consequently, where the director, officer or employee is generally acting in furtherance of the corporate interest, "the addition of a spite motive usually is not regarded as sufficient to result in liability." *Id*. at 333 (quoting W. Page Keeton, Prosser & Keeton on the Law of Torts § 130, pp. 1009-10 (5th ed.1984)). He may be held liable if "the reason underlying his interference is purely a malevolent one, and a desire to do harm to the plaintiff for its own sake." *Id*. In *Forrester*, the Court emphasized that the public interest is served by corporations having candid advice from their officers and employees, and noted that fear of individual liability would limit such advice. *Id.* at 334. Consequently, the actions of an officer, director or employee of a corporation are considered to be the actions of the corporation so long as he is acting "within the general range of this authority, and his actions are substantially motivated by an intent to further the interest of the corporation." *Id*. at 334-35. Under these circumstances, the director, officer, or employee is immune from individual liability. *Id*.

*Thompson*, 416 S.W.3d at 413 (citing *Lyne v. Price*, No. W2000-00870-COA-R3-CV, 2002 WL 1417177, at *2-3 (Tenn. Ct. App. June 27, 2002)).  Indeed, the Governmental Tort Liability Act ("GTLA") also limits the liability that can be imposed on board members, who serve governmental entities:

All members of boards, commissions, agencies, authorities, and other governing bodies of any governmental entity, created by public or private act, whether compensated or not, shall be immune from suit arising from the conduct of the affairs of such board, commission, agency, authority, or other governing body.  Such immunity from suit shall be removed when such conduct amounts to willful, wanton, or gross negligence.

Tenn. Code. Ann. §29-20-201(b)(2).  The GTLA justifies this limitation of liability as follows:

The general assembly finds and declares that the service of governmental entity boards, commissions, authorities and other governing agencies are critical to the efficient conduct and management of the public affairs of the citizens of this state. Complete and absolute immunity is required for free exercise and discharge of the duties of such boards, commissions, authorities and other governing agencies. Members of boards, commissions, authorities, and other governing agencies must be permitted to operate without concern for the possibility of litigation arising from the faithful discharge of their duties.

Tenn. Code Ann. § 29-20-201(b)(1).[4]

Other cases interpreting the *Forrester* holding have emphasized that a plaintiff, who asserts a claim for intentional interference with employment, must allege facts showing that the defendant stood as a third-party to the relationship between the plaintiff employee and the employer. For example, in *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc*., 33 S.W.3d 779 (Tenn. 2000), the Tennessee Supreme Court stated:

> *Forrester* indicates that Tennessee has recognized a privilege against an interference of contract claim when there is unity of interest between the interfering party and the breaching party. *Forrester* also shows that the claim can be alleged successfully only when the interfering party is a third party not closely tied to the operation of the reaching corporation.

*Id*. at 782. Furthermore, in the *Lyne* case, this Court noted that ill will or spite in and of itself "is not sufficient to result in liability" for intentional interference with employment. *Lyne*, 2002 WL 1417177, at *3 (citing *Forrester*, 869 S.W.2d at 333). Rather, to show that the defendant stood as a third party to the plaintiff's employment relationship, the court looks for facts showing "that the defendant[] would benefit personally from plaintiff's discharge." *Thompson*, 416 S.W.3d at 414 (quoting *Fitzgerald v. Abbott*, No. M2008-00920-COA-R3-CV, 2009 WL 304421, at *2 (Tenn. Ct. App. Feb. 5, 2009)). For example, in *Lyne*, this Court held that the plaintiff's complaint alleged facts sufficient to show that the defendant Coach Price stood as a third party to the plaintiff's employment with the university. *Lyne*, 2002 WL 1417177, at *4. As the plaintiff's supervisor, Coach Price had the authority to terminate her employment with the university; however, in addition to his position as the university's basketball coach, Coach Price also operated basketball camps that were independent from his work with the university. *Id*. The plaintiff performed administrative jobs related to both the university's basketball team and Coach Price's basketball camps. *Id*. In her complaint, plaintiff asserted that "Coach Price's procurement of her termination was motivated by her

---

[4] We note that the trial court did not rely on the GTLA in reaching its decision.

actions or refusal to act related to the basketball camp, separate from Coach Price's job duties as head basketball coach, and in furtherance of his individual economic interests." *Id*. This Court held that plaintiff's allegations were sufficient to state a claim for intentional interference with employment. *Id*.

Based on the foregoing authority, in order to sustain her causes of action for intentional interference with employment and conspiracy, at the summary judgment stage, Ms. Hill must "set forth specific facts . . . showing that there is a genuine issue" of fact concerning the question of whether Mr. Gannon's actions were "within the general range of [his] authority, and [whether] his actions [were] substantially motivated by an intent to further the interest[s] of [UCHRA]." Tenn. R. Civ. P. 56.06; *Thompson*, 416 S.W.3d at 413.

Like the plaintiff in *Thompson*, Ms. Hill's complaint sets out her claim for intentional interference with employment in general conclusory terms, i.e., "Gannon intentionally and without justification secured the discharge of the plaintiff. At the time of this conduct, Mr. Gannon lacked authority to terminate and the adverse job action was not made in pursuit of any legitimate function as a member of the Board of the Agency, but was made for personal reasons, vindictiveness, and in order to engage in favoritism contrary to his duties as a member of the Board." The question is whether the evidence submitted in connection with the motion for summary judgment and Ms. Hill's opposition thereto, raises a legitimate question concerning Mr. Gannon's motivation. Specifically, under *Thompson*, Ms. Hill has the burden to show that Mr. Gannon: (1) intentionally; and (2) without justification; (3) procured the termination of Ms. Hill's employment; (4) while standing as a third party to the employment relationship. *Thompson*, 416 S.W.3d at 413. In this regard, Ms. Hill's burden is a high one. Even if we assume, *arguendo*, that Mr. Gannon intentionally procured the termination of Ms. Hill's employment, this fact is not sufficient to create liability. Furthermore, even if we assume, *arguendo*, that Mr. Gannon had procured the termination of Ms. Hill's employment because of some ill will or spiteful motive, that fact (or dispute thereof) is not sufficient, standing alone, to create liability on Mr. Gannon's part. *Thompson*, 416 S.W.3d at 413 (citing *Lyne v. Price*, No. W2000-00870-COA-R3-CV, 2002 WL 1417177, at *2-3 (Tenn. Ct. App. June 27, 2002)). Rather, he may only be held liable for intentional interference with at-will employment if "the reason underlying his interference is **purely** a malevolent one, and a desire to do harm to the plaintiff for its own sake." *Id*. (quoting *Forrester*, 869 S.W.2d at 334-335).

In *Forrester*, the Court emphasized that the public interest is served by corporations having candid advice from their officers and employees, and noted that fear of individual liability would limit such advice. *Forrester*, 869 S.W.2d at 334. Consequently, the actions of an officer, director or employee of a corporation are considered to be the actions of the corporation so long as he is acting "within the general range of this authority, and his actions are substantially motivated by an intent to further the interest of the corporation." *Id*. at 334-

- 11 -

35. Under these circumstances, the director, officer, or employee is immune from individual liability. *Id*. To show that the defendant stood as a third party to the plaintiff's employment relationship, the Court looks for facts showing "that the defendant[ ] would benefit personally from plaintiff's discharge." *Thompson*, 416 S.W.3d at 414 (citing *Fitzgerald v. Abbott*, No. M2008-00920-COA-R3-CV, 2009 WL 304421, at *2 (Tenn. Ct. App. Feb. 5, 2009)).

Ms. Woolbright testified that the board "has nothing to do with employees" and that the board tells the director what to do, but the board "cannot tell you how—how to work with the employee." Even if we concede that the UCHRA employees work for the UCHRA executive director, the executive director is still, nonetheless, answerable to the board. In this regard, it is undisputed that the UCHRA board has supervisory responsibility over the agency. *See generally* Human Resource Agency Act of 1973, Tenn. Code Ann. §§ 13-26-101 *et seq.* The question, then, is whether Mr. Gannon's actions were in furtherance of the UCHRA's interest, or whether he stood to personally benefit from Ms. Hill's discharge.

The record shows, without dispute, that prior to Mr. Collins' appointment as UCHRA's Executive Director, Ms. Woolbright was working to reduce overhead at the agency. To that end, Ms. Woolbright had cut some $1,800,000 in costs during her tenure as executive director. Mr. Collins testified that he was determined to continue with cost cutting measures after he was named to the executive director position. To that end, Mr. Collins proposed the following cuts: (1) eliminate the job of Accounts Payable Supervisor to save UCHRA $47,023; (2) eliminate the Executive Secretary position (i.e., Ms. Hill's position) to save the agency $71,357 (including both pay and benefits); (3) create an Administrative Assistant with no supervisory responsibilities to take the place of the executive secretary position; (4) eliminate duplicate Jackson County Coordinator positions and reduce pay from $40,676 to $20,000; (5) not replace the WIA Technical Assistant Specialist who retired for a savings of $40,814; and (6) cut the pay of employees making more than $60,000 by 7.5% to save the UCHRA $62,677.

Concerning his reason for terminating Ms. Hill's employment, in his deposition, Mr. Collins testified, in relevant part, as follows:

> Well, with Ms. Hill, I noticed she was only supervising one employee. And I noticed that she wasn't very busy. You know, she was sitting a lot, you know, waiting for the phone to ring or somebody to come in.

Although Ms. Hill initially supervised up to four employees, it is undisputed that, at the time her employment was terminated, she was supervising only one other employee. Mr. Collins further testified that "considering the financial situation [of the UCHRA]," he could not "justify $72,000 [i.e., Ms. Hill's salary including wages and benefits] for somebody that

didn't do very much and only supervised one employee." In her own deposition, Ms. Hill concedes that Mr. Collins' reduction of salaries and staff was a legitimate business purpose:

> Q. Okay. Well, you do know that one of the first things that Mr. Collins did when he started was to reduce the salaries of persons making over $60,000 a year?
>
> A. I understood it was anyone over $59,000, they took a 6 percent cut.
>
> Q. Okay. You understood that that was one of the first things that Mr. Collins did when he started was to cut persons, you know, with high salaries?
>
> A. Yes. . . .
>
> ***
>
> Q. And he did that across the entire agency. Is that right?
>
> A. That was my understanding.
>
> Q. And you understood that the purpose of that cut was to save money?
>
> A. Yes, sir.
>
> Q. All right. And there's nothing wrong with an Executive Director trying to save money for the Agency?
>
> A. No, certainly not.

Importantly, Ms. Hill was not the only employee whose salary or position was affected by Mr. Collin's cuts. In fact, on the same day that Ms. Hill's position was terminated, Norm Dukes and Jill McCormick received notice that their positions, too, had been eliminated. Ms. Hill acknowledged this fact in her deposition testimony:

> Q. All right. Now, you were not the only person whose employment was affected on July the 13th, were you?
>
> A. No. There was a gentleman and a young lady.
>
> Q. All right. Now, the gentleman, Norm Dukes . . . was working as a County Coordinator in Putnam County?

A. Yes, sir.

*** 

Q. They [i.e., the UCHRA] eliminated [Mr. Duke's] position . . . A job was eliminated?

A. Yes. But [Mr. Dukes] was offered another job.

Q. Yes, ma'am. He was offered a job as an ORR Clerk . . . . Do you know what his salary was before . . . when he was a County Coordinator in Putnam County?

*** 

A. No. You can look it up on that list.

Q. All right. It's listed here as $40,676.16. . . . Would it surprise you to learn that [Mr. Dukes' salary was reduced to] the $20,000-range?

A. Nothing would surprise me.

*** 

Q. Now, Jill McCormick was laid off from her position. You know that to be true also?

A. That's my understanding.

*** 

Q. All right. Now, Ms. McCormick was making $32,650 a year, is that right.

A. I don't know what she was making.

Q. Okay. And if the testimony is she was making over $32,000 a year, you don't have any dispute or you are not going to contradict that, are you?

A. No, sir.

***

Q. Okay. Now, ultimately, do you also know that Ms. McCormick took another position elsewhere in the Agency

A. I understand that she was offered another position.

***

Q. Well, would it surprise you to learn that Jill McCormick, when she took that job, had a salary in the range of $18,000 to $19,000?

A. Nothing would surprise me.

Like Mr. Dukes and Ms. McCormick, the record shows that Ms. Hill was encouraged to apply for a different, although lower paying position at the UCHRA. This fact is evinced by a June 26, 2012 email from Katrina Cubbins to Ms. Hill, wherein Ms. Cubbins stated:

I had just left you a message regarding the posting that you had applied for. Since then, I have been told that you were not in the office today. It is my understanding that the current position is being eliminated and the new position will be an Administrative Assistant, with no supervisory responsibility, at $29,000.00 per year. I am talking to everyone else today that applied for the previous position to allow them an opportunity to reapply for the new position before it is posted tomorrow. Please let me know if you are interested in reapplying for the Administrative position.

On June 27, 2012, Ms. Hill replied to Ms. Cubbins' email, stating: "I am on vacation! I shall consult my attorney and he/I will advise u accordingly." On June 29, 2012, Ms. Cubbins replied: "The deadline has been extended to Monday, July 2nd so that you may apply, if you wish, when you return. Another candidate was also on vacation and she has been contacted as well." When asked, in her deposition, about her treatment in comparison to the treatment that Mr. Dukes and Ms. McCormick received, Ms. Hill testified, in relevant part, as follows:

Q. All right. If, in fact, it [i.e., Mr. Dukes' salary in his new position with the UCHRA] was in the $20,000 range, that is a significant reduction in pay for Mr. Dukes—is that right—from forty-something thousand dollars to twenty-something thousand dollars?

A. Certainly.

Q. Certainly at least a 45 percent reduction, right?

- 15 -

A. I don't know. I'd have to calculate it.

Q. Well, that was the same basic reduction that you were offered for the Administrative Assistant position?

A. I wasn't offered the Administrative Assistant position.

Q. You were asked to apply?

A. [Mr. Dukes] was offered a job.

Q. Were you asked to apply for the Administrative Assistant job?

A. I wasn't asked. I received an email.

Q. And you didn't apply, and you didn't make any attempt to get that job, right?

A. No, sir. But Mr. Collins had my resume, and he had already interviewed me.

Q. You didn't apply for the Administrative Assistant job or make any attempt to get that job. Isn't that true?

A. I guess that's true.

In light of the undisputed fact that, even before Mr. Collins was appointed as UCHRA's executive director, the agency was undergoing significant changes in order to save funds, the fact that Mr. Collins continued the work begun by Ms. Woolbright is not indicative of any adverse action specifically directed toward Ms. Hill. Rather, Ms. Hill's position, like that of her peers, Mr. Dukes and Ms. McCormick, was deemed redundant and the position was terminated in favor of a more cost-effective structure. In Ms. Hill's case, it is also undisputed that her supervisory role had been significantly reduced; as noted above, at the time her employment was terminated, Ms. Hill was only supervising one employee as opposed to the four that she had previously supervised. This fact, in addition to the undisputed testimony of Mr. Collins concerning his own observation that Ms. Hill was not as busy during the work day as she had been, supports the Appellees' position that the adverse decision concerning Ms. Hill's position was not made out of malevolence, but was made in an effort to ensure that the UCHRA's funds were used efficiently.

Concerning the remaining question of whether Mr. Gannon stood to personally benefit from the termination of Ms. Hill's employment, the record, at most, creates innuendo. However, Ms. Hill has provided no specific facts to support her argument that Mr. Gannon's motivation, in allegedly influencing Mr. Collins to fire Ms. Hill in exchange for Mr. Collins' appointment to the executive director position, was in furtherance of his friendship with Ms. Beth Stephens. As stated in Ms. Hill's brief, she "did not allege or attempt to prove that this relationship was consummated. The point is that a friendship which will induce a man [i.e., Mr. Gannon] to plot and scheme, to secure informants, to seek documents furtively and to reach secret bargains . . . cannot reasonably be said to represent the mere pursuit of a corporate interest." Even if we allow, *arguendo*, that Mr. Gannon did all of these things, Ms. Hill nonetheless must show, through the proffer of specific facts, that Mr. Gannon "would benefit personally from [Ms. Hill's] discharge." **Thompson**, 416 S.W.3d at 414 (citation omitted). We have reviewed the entire record, and there is simply no evidence from which to infer that Mr. Gannon received any personal benefit from the termination of Ms. Hill's employment. Not only is there insufficient evidence to support Ms. Hill's allegation that Mr. Gannon had some relationship with Ms. Stephens that went beyond a working relationship, but there is also no evidence that Mr. Gannon received some direct personal benefit such as existed in the **Lyne v. Price** case, *supra*. Therefore, we conclude that the trial court did not err in granting summary judgment in favor of the Appellees on Ms. Hill's claim for intentional interference with at-will employment. Because Ms. Hill's claim for intentional interference with employment cannot survive summary judgment, her claim for civil conspiracy must likewise fail. **Watson's Carpet and Floor Coverings, Inc. v. McCormick, et al.**, 247 S.W.3d 169 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. May 14, 2007) (citing **Halberstam v. Welch**, 705 F.2d 472, 479 (D.C.Cir.1983)) ("Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.").

## V. Conclusion

For the foregoing reasons, we affirm the order of the trial court granting summary judgment in favor of the Appellees. We remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Jana Hill and her surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE